UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

D-01 AREF NAGI,
D-05 MICHAEL CICCHETTI,
D-17 GARY BALL, JR.,
D-18 LEONARD ("DAD") MOORE,
D-20 JOSEPH WHITING,
D-37 ANTHONY CLARK,

        Defendants.

_____/

Case No. 06-20465

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANTS' RULE 29 MOTIONS FOR ACQUITTAL AND RULE 33 MOTIONS FOR A NEW TRIAL [1515, 1523, 1524, 1525] AND JOINDERS [1526, 1533]**

This matter comes before the Court after an extensive jury trial that began on April 1, 2010 and concluded with guilty verdicts on June 3, 2010. Defendants Nagi, Cicchetti, Ball Jr., Leonard "Dad" Moore, Joseph Whiting, and Anthony Clark, along with numerous other individuals, were charged in a second superseding indictment with violating federal racketeering laws and other federal laws involving violent acts, firearms, controlled substances, and stolen property. The jury returned the following guilty verdicts:

D-01 Aref "Steve" Nagi
Ct. 1  -  18 U.S.C. § 1962(c)    Racketeer Influenced and Corrupt Organization
                                    ("RICO") - Conducting or Participating in affairs
                                    of an Enterprise through a Pattern of Racketeering
                                    Activity
Ct. 2  -  18 U.S.C. § 1962(d)    Conspiracy to violate RICO
Ct. 7  -  18 U.S.C. § 1959(a)(3)  Assault with a dangerous weapon in aid of

| | | Racketeering ("Wheat & Rye") |
|---|---|---|
| Ct. 15 - | 18 U.S.C. § 2312 | Conspiracy to transport stolen vehicles in Interstate Commerce ("Myrtle Beach") |
| Ct. 16 - | 18 U.S.C. §§ 511, 371 | Conspiracy to alter, remove, and obliterate Vehicle Identification Numbers ("Walkabout Cycle") |
| Ct. 19 - | 21 U.S.C. § 846 | Conspiracy to Possess with intent to distribute and Distribution of Controlled Substances |
| Ct. 31 - | 18 U.S.C. § 924(c) | Use of Firearm during and in relation to crime of violence ("Wheat & Rye") |

D-05 Michael "Cocoa" Cicchetti

| | | |
|---|---|---|
| Ct. 2 - | 18 U.S.C. § 1962(d) | Conspiracy to violate RICO |
| Ct. 7 - | 18 U.S.C. § 1959(a)(3) | Assault with a dangerous weapon in aid of Racketeering ("Wheat & Rye") |
| Ct. 19 - | 21 U.S.C. § 846 | Conspiracy to Possess with intent to distribute and Distribution of Controlled Substances ("Nagi")(less than 1 kilogram cocaine) |
| Ct. 31 - | 18 U.S.C. § 924(c) | Use of Firearm during and in relation to crime of violence ("Wheat & Rye") |

Gary "Junior" Ball Jr.

| | | |
|---|---|---|
| Ct. 1 - | 18 U.S.C. § 1962(c) | Racketeer Influenced and Corrupt Organization ("RICO") |
| Ct. 2 - | 18 U.S.C. § 1962(d) | Conspiracy to violate RICO |
| Ct. 15 - | 18 U.S.C. § 2312 | Conspiracy to transport stolen vehicles in Interstate Commerce ("Myrtle Beach") |
| Ct. 19 - | 21 U.S.C. § 846 | Conspiracy to Possess with intent to distribute and Distribution of Controlled Substances ("Nagi")(more than 5 kilograms cocaine) |
| Ct. 20 - | 21 U.S.C. § 846 | Conspiracy to Possess with intent to distribute and Distribution of Controlled Substances ("Whitehouse") |
| Ct. 36 - | 18 U.S.C. §§ 511, 371 | Conspiracy to alter, remove, and obliterate vehicle identification numbers ("Pal's Auto") |

Leonard "Dad" Moore

| | | |
|---|---|---|
| Ct. 2 - | 18 U.S.C. § 1962(d) | Conspiracy to violate RICO |

Joseph "Little Joe" Whiting

| | | |
|---|---|---|
| Ct. 1 - | 18 U.S.C. § 1962(c) | Racketeer Influenced and Corrupt Organization ("RICO") |
| Ct. 2 - | 18 U.S.C. § 1962(d) | Conspiracy to violate RICO |
| Ct. 13 - | 18 U.S.C. § 1959(a)(5) | Conspiracy to commit murder in aid of Racketeering ("Doug Burnett") |

| Ct. 47 - 18 U.S.C. § 2313 | Receipt and Possession of Stolen Vehicle in Interstate Commerce ("Myrtle Beach") |

Anthony "Mad Anthony" Clark
| Ct. 2 - 18 U.S.C. § 1962(d) | Conspiracy to violate RICO |

The Court now considers the following defense motions seeking either acquittal or a new trial: (1) Defendant Anthony Clark's post-trial motion for acquittal pursuant to Fed. R. Crim. P. 29(c) [1515], (2) Defendant Leonard "Dad" Moore's motion for judgment of acquittal or for a new trial [1523], (3) Defendant Cicchetti's renewed motion for judgment of acquittal and/or new trial [1524], joined by Defendant Nagi [1526], and (4) Defendants Whiting's, Dad Moore's, Cicchetti's, Ball Jr.'s, and Nagi's consolidated motion for judgment notwithstanding the verdict or, in the alternative, for a new trial [1525], joined by Defendant Anthony Clark with regard to Rule 29 issues and arguments only [1533]. For the reasons stated more fully below and on the record at the September 7, 2010 motion hearing, this Court DENIES Defendants' motions.

## I.    Background

During the course of the two month long jury trial, approximately 50 fifty witnesses – including Co-Defendants – testified and hundreds of exhibits were entered into the record. A brief overview of that evidence is as follows.

Defendants share a common factor. Each has held a leadership position in the Highwaymen Motorcycle Club ("HMC").

The HMC was founded in Detroit in 1954. Although not a national club, it has chapters in Kentucky, Tennessee, Florida, and Indiana. At one time, it also had an Alabama chapter. In Michigan, chapters are located in Detroit (four chapters), the Downriver area, Washtenaw County, Monroe, and Lansing. Chapter officers include a

president, vice president, treasurer, master sergeant at arms, sergeant at arms, and general members. The vice president takes over the duties of the president in his absence. The treasurer is responsible for conducting roll call at HMC meetings, records member dues, and handles all chapter finances. The secretary is responsible for taking notes during HMC meetings. The secretary and treasurer positions are often held by the same person. (Trial Tr. Vol. 4, Brzezinski at 4-6.) The sergeant at arms or master sergeant is responsible for collecting past dues from delinquent members, protects the chapter president, and acts as an enforcer by carrying out all the president's orders. Numerous witnesses testified that the chapter president decides the punishment, and the master sergeant carries it out in the back room. (Trial Tr. Vol. 19, McDonald at 8-10.) For example, witness William Bridges testified about an incident where a young man was being thrown out of the HMC, was taken into the clubhouse back room, and was beaten. HMC members held him down and tattooed a big black mark over the HMC tattoo on the young man's arm.

Each chapter has a clubhouse which is used for a variety of purposes like holding meetings, parties, and other events. Each chapter has weekly, mandatory meetings that all members are required to attend, and a member is fined if he fails to do so. Regular "bosses" meetings are also scheduled and attended by the national president, chapter presidents, and "committee" members.

Membership in the HMC is limited to males and is the result of a controlled selection process initiated when an individual becomes an associate or "probie." After completion of a probation period, the new member then obtains "patched" member status. Patched and probated HMC members are required to attend special events referred to as "runs."

Examples of "runs" include the annual Daytona Bike Week, Biketoberfest, and the Sturgis, South Dakota motorcycle rally. Failure to attend a mandatory "run" can subject a member to disciplinary action.

Members are expected to abide by a written HMC constitution and by-laws. Violations may result in fines, expulsion, another probationary period, or physical violence. Several HMC witnesses testified that, although the HMC constitution had rules on no drugs in the clubhouse and no police as members, these rules were ignored because several members were police officers and no HMC officer ever tried to stop the common occurrence of drug activity in the HMC clubhouses. (Trial Tr. Vol. 19, McDonald at 25-26.) Doug Burnett testified that he used some of his drug sales profits to pay his HMC dues. (Trial Tr. Vol. 5, D. Burnett at 74-75.) Numerous witnesses testified that the HMC chapters sold alcohol despite the lack of a liquor license, and donation signs were just a ploy to get around the police. Some HMC chapters also had poker machines that paid out winnings.

Members wear "colors" or leather vests or jackets with the HMC emblem on the back. The colors may display other symbols. These include "MC" for motorcycle club; a 1% patch to distinguish the HMC from the 99% of legitimate, law abiding motorcycle groups; and lightening rod patches, which are awarded to members who perform a violent act either on behalf of the HMC or at the request of HMC leaders.

Gerald Peters testified that before 2004, membership in the HMC was 24/7 – you could not have a job. After 2004, the HMC wanted money, so members were allowed to have jobs. As support, the government entered into evidence the vest belonging to Lansing Chapter President Michael Kukla with the 24/7 emblem on it.

Under the HMC's organizational structure, the national president supervises all

chapters, and the president of the Detroit chapter holds the position of second in command. According to witnesses, Defendant Anthony Clark was the first national president, followed by Gerald Peters, and then Joseph Whiting. All other chapter presidents report to the Detroit president. Numerous witnesses also testified that, despite leadership titles held by others, Defendant Leonard "Dad" Moore, who was known as the HMC "godfather," had the top position of power and controlled the HMC from behind the scenes. Dad Moore has been a long time member of the HMC, was involved in all critical decisions, and is recognized by members as HMC's true leader. (Trial Tr. Vol. 16, L. Fitzner at 15-16; Vol. 7, B. Burton at 71; Vol. 13, G. Peters at 100-01; Vol. 18, D. Sanchez at 11-12, 26-27.) For example, Gerald Peters testified that he was angry when the Westside Chapter voted Dad Moore in as godfather because, in his mind, Max Barnes was the true godfather. Peters further testified that, after that vote, Dad Moore painted his name in gold on his colors — everyone else wears their name in silver. Dad's vest, which was entered as a government exhibit, was seized during a search of his home. Traces of gold paint are visible on the vest. Another witness, Doug Burnett testified that Dad told him that he (Dad) was the godfather of the HMC. Burnett also testified that Dad ran the HMC — that you had to run everything through him and Whiting. Gerald Peters testified that, when he stepped down as the national president, Dad called him and told Peters that Dad was putting Whiting in as national president and that Peters would be president of the Eastside chapter.

Almost every cooperating witness explained that the HMC had set up a "committee" to oversee the activities of and make decisions for the HMC, including discipline of members. (Trial Tr. Vol. 7, Burton at 70-71; Vol. 17, N. Sanchez at 10; Vol. 16, L. Fitzner at 10-11.) Members of the "committee" included: Robert Burton, Joseph Burton, Dad

Moore, Joseph Whiting, Anthony Clark, Michael Cicchetti, and Aref Nagi.  Witnesses further testified that everything went through the committee and that Joseph Whiting, as national president, oversaw everything.  Robert Burton testified that, although committee members changed, Dad Moore ran the committee.  (Trial Tr. Vol. 7, Burton at 71.)  Lou Fitzner testified that Dad Moore, Joseph Whiting, and Michael Cicchetti were constant members of the committee, and others fluctuated in and out.  (Trial Tr. Vol. 16, L. Fitzner at 8-10, 16-17, 80.)  The HMC also had honorary members or "honoraries;" past officers and long-time members voted in by HMC members.  Honoraries served on the committee and advised the national president.  Honoraries included Dad Moore, CICCHETTI, Whiting, Clark, and Ball.  (Trial Tr. Vol. 7, Burton at 70-71; Vol. 18, D. Sanchez at 11.)

There was ample evidence at trial of HMC associated criminal activity, including acts of violence like arson, assault, conspiracy to commit murder, and robbery as well as theft, drug trafficking, and weapons offenses.  Much of this violence results from the HMC being in constant conflict with rival biker clubs.  HMC leadership enforces its authority over a territory by directing members to attack rival gangs.  Other attacks are directed at persons who, although unaffiliated with a rival gang, are perceived to disrespect an HMC member. The HMC also plans and directs attacks against those perceived to have "squealed" and are "snitches."  Witness testified that, because of their reputation for violence, an HMC member is more likely to get away with a crime due to the victim's fear of retaliation if the crime is reported.  HMC members are fully aware of and actively cultivate this fear of retaliation.  Handling situations for the HMC improves or enhances your standing and reputation in the HMC.  Witnesses testified that HMC members always travel in large groups and go to bars in large numbers to reenforce the message that you don't mess with

the HMC.

## II. Analysis

At the end of the government's case-in-chief, Defendants moved for a directed verdict of not guilty. Those motions were denied, and the trial continued to a jury verdict of guilt as to all Defendants. Defendants have now filed post-trial motions for acquittal or a new trial. The Court first considers Defendants' motions for a new trial brought pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

### A. Rule 33 Motion for New Trial

### 1. Standard of Review

As the Sixth Circuit recently observed, "[a] motion for a new trial under Rule 33 is premised on the argument that the jury's verdict was against the manifest weight of the evidence." *United States v. Montgomery*, 358 F. App'x 622, 628 (6th Cir. 2009) (citing *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007)). "In considering the weight of the evidence for purposes of adjudicating a motion for a new trial, the district judge may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *Id.* "Generally, such motions are granted only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *Id.* (internal quotation marks and citations omitted).

### 2. The Government Did Not Engage in a Pattern of Misconduct

Defendants move for a new trial, arguing that the government engaged in a pattern of prosecutorial misconduct. First, with regard to the government's use of informants, Defendants contend that the government (a) violated its obligations under *Brady v.*

*Maryland*, 373 U.S. 1983 (1963) by providing untimely notice of payments to informants and cooperating witnesses; (b) improperly paid money to cooperating witnesses, including the payment of a bonus to Douglas Burnett for testimony in the *Viramontez* prosecution; (c) violated established procedure for U.S. Attorneys by not entering into Rule 11 plea agreements with cooperating Defendants; (d) coerced the testimony of cooperating Defendant Christopher Miller; and (e) improperly shielded cooperating Defendant Daniel Sanchez from cross-examination regarding his admitted participation in a murder at a HMC Detroit clubhouse and the subsequent arson of the clubhouse in an attempt to conceal that murder. Second, with regard to the government's proofs at trial, Defendants contend that the government (a) improperly proceeded to trial on several charges that it knew it could not prove and which were ultimately dismissed at the close of the government's case-in-chief; (b) improperly portrayed Defendants as belonging to a violent organization despite knowing that it could not prove that some Defendants had engaged in violent acts; and (c) improperly introduced evidence of uncharged crimes, i.e., unauthorized sale of alcohol and gambling in HMC clubhouses.

### a. Government's Use of Informants/Co-Defendants

#### (i) Timely Notice to Defendants

The Court first addresses Defendants' arguments that the government violated its *Brady* obligations by providing untimely notice of payments to informants and cooperating witnesses. Despite Defendants' arguments to the contrary, the government provided timely notice of the challenged payments and thus did not violate its *Brady* obligations.

On March 26, 2010, during a pre-trial motion hearing at which all Defendants were present, the government hand delivered a letter (Gov't Resp., Ex. 1) to defense counsel

identifying payments made to witnesses, including the amounts specifically attributed to witness relocation:

| | | |
|---|---|---|
| Louis Fitzner | - | $16,742.16 ($14,742.16 of it for relocation) |
| Gerald Peters | - | $20,705 ($10,705 of it for relocation) |
| Douglas Burnett | - | $73,412.72 ($27,500 of it for relocation) |
| Robert Burton | - | $10,927.64 (all for relocation) |
| Daniel Sanchez | - | $16,200 (all for relocation) |
| Gerald Deese | - | $ 500 |

(*Id.* at 1.) As revealed in the March letter, defense counsel was informed before trial that Robert Burton and Daniel Sanchez received money only for relocation. As far as the government can recall, the $500 Gerald Deese received was for payment of a fine or ticket. Three witnesses – Lou Fitzner, Gerald Peters, and Doug Burnett – received money in excess of relocation costs. Also, on April 19, 2010, during trial but well in advance of his May 11, 2010 testimony, the government hand delivered another letter to Defendants that detailed the payment of $44,037.34 to Phil McDonald, all of which was used for relocation. (Gov't Resp., Ex. 2, 4/19/10 letter at 1.)

The Sixth Circuit has observed that "'[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one. . . .'" *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)). The *Mullins* court further explained:

> Rather, *Brady* is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial. Reversal is only required, therefore, where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome. Furthermore, the *Brady* rule only applies to the discovery, *after trial*, of information which had been known to the prosecution but *unknown to the defense*.

*Id.* (internal quotation marks and citations omitted and emphasis added). Accordingly, "[t]o establish a *Brady* violation, [the defendant] has the burden of showing that the Government suppressed evidence, that such evidence was favorable to the defense, and the suppressed evidence was material." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). Defendants have not met that burden.

Here, before each witness testified, Defendants had notice of payments made by the government to each witness along with notice of the portion of each payment that was attributed to relocation costs. Defendants thus had ample opportunity during cross examination to explore these witness payments, beginning with the cross examination of the government's first witness, Special Agent Ted Brzezinski. Despite Defendants' arguments to the contrary, Agent Brzezinski's testimony at trial notified them of the breakdown of all sums Doug Burnett received, thus allowing them to cross examine both Agent Brzezinski and Burnett about the $25,000 bonus Doug Burnett received for his cooperation in connection with the Anthony Viramontez case. (Trial Tr., Vol 4, Brzezinski at 26, 111-14; Vol. 5, Brzezinski at 11-13, 16-21, 29-32; Vol. 5, Burnett at 113, 116-19, 131-34.)

### (ii) Payments to Witness Is Not Contrary to Law or U.S. Attorney Guidelines

Defendants argue that the payments made by the government to witnesses in this case were contrary to U.S. Attorney Guidelines and were, in essence, more susceptible to abuse than the informer contingent fee arrangements condemned by the Fifth Circuit in *Williamson v. United States*, 311 F.2d 441 (5th Cir. 1962). Defendants' arguments are rejected. As Defendants acknowledge, the Sixth Circuit has refused to apply the *Williamson* exclusionary rule involving contingent fee arrangements with informers and

held, in *United States v. Grimes*, 438 F.2d 391, 395 (6th Cir. 1971), that "[r]ather than

adopting an exclusionary rule for a particular factual situation, irrespective of the mode of

payment, we prefer the rule that would leave the entire matter to the jury to consider in

weighing the credibility of the witness informant." The *Grimes* court concluded that "this

approach provides adequate safeguards for the criminal defendant against possible abuses

since the witness must undergo the rigors of cross examination." *Id.* It reasoned that

paying an informant "on a contingent fee arrangement for the conviction of specified

persons for crimes not yet committed," was "no more likely" to "be prone to lie and

manufacture crimes . . . than witnesses acting for other, more common reasons." *Id.* at

395-96. It explained further.

> Frequently, for example, one co-defendant testifies against another co-defendant
> with the expectation of favorable treatment as a reward for his testimony. Like
> the informant being paid on a contingent fee basis, a co-defendant so testifying
> may feel it imperative to obtain a conviction of his co-defendant in order to
> improve his own position. Similarly, informants paid on bases other than a
> contingent arrangement may feel that their employment will be terminated if they
> do not bring about a conviction. Therefore, despite admonitions to the contrary,
> they may believe that their future employment as an informant depends on the
> manufacture of crimes in order to prove their worth to the government. Neither
> of these methods of "paying" informers has been seriously attacked by the
> courts; yet the potential for abuse is obvious in each case.

*Id.* at 396 (internal footnote omitted). In rejecting application of the *Williamson* rule in the

Sixth Circuit, the *Grimes* court observed that "[i]t is well-recognized that informers are an

important and necessary aspect of our system of criminal justice" and concluded that cross-

examination was an adequate means for defense counsel to place before the jury the

issues of witness credibility and the weight that should be placed on an informant witness's

testimony. *Id.*

Defendants fail to convince the Court that it should ignore this well-established Sixth

Circuit precedent. Defendants had ample opportunity to cross-examine Agent Brzezinski and witness Doug Burnett about Burnett's expectation of a reward or bonus in this matter similar to the one he obtained as a result of his cooperation in the Viramontez criminal matter. Mr. Burnett consistently testified that the federal agents had told him that if he was truthful, they could recommend that he be paid a bonus in this matter, that no specific amount was ever mentioned, and that "[a]ll's I'm doing is going to speak truthful about this case," and that he did not know he was going to get $25,000 for the Viramontez case but "still did it anyway." (Trial Tr. Vol. 5, Burnett at 117-19, 132-34; *see also* Trial Tr. Vol. 5, Brzezinski at 30-32.) Mr. Burnett came in voluntarily to assist the FBI; he had not been charged at the time with any crime nor was he the subject on any FBI investigation. He was involuntarily relocated in 2006 away from his children. His parents had to move three times since this case started. He received the Viramontez $25,000 bonus in 2007 and continued to cooperate with the government. (*Id.*)

Defendants' second argument also lacks merit. Testimony at trial established that the government followed the Attorney General Guidelines concerning witness payments. Agent Brzezinski testified on direct and cross examination about the amounts and justifications for payments made to witnesses. There was extensive cross examination about the procedures, rules, policies, and levels of approval necessary to provide funds of any kind to informants, cooperating defendants, and witnesses, including approval from the Justice Department. (Trial Tr. Vol. 4, Brzezinski at 75-86, 94-97.)

Agent Brzezinski testified that informants, witnesses, and cooperating defendants are commonly provided funds to compensate for a lack of income while they actively work for the FBI. This allows them to maintain a lifestyle that provides access to the individuals the

FBI is investigating. (Trial Tr. Vol. 4, Brzezinski at 25-26, 76, 107-109.) He also testified that relocation funds are determined by Justice Department calculations based on moving costs, number of family members involved, as well as cost of living expenses for several months after a witness is relocated. (Trial Tr. Vol. 5, Brzezinski at 17-18.)

Three witnesses received money from the government solely for relocation: Phil McDonald, Robert Burton, and Daniel Sanchez. Mr. Deese received $500 which, as far as the government can recall, was for Deese's payment of a fine or ticket. Three witnesses – Doug Burnett, Lou Fitzner, and Gerald Peters – received funds from the government in addition to their relocation costs.

As discussed above, Mr. Burnett was paid a $25,000 bonus in the Viramontez criminal matter and $27,000 for relocation purposes in this matter. Doug Burnett was also paid approximately $2,500 a month to pay for living expenses like cell phone bills, gas, and rent as well as money that allowed him to maintain a lifestyle that provided Burnett with access to the individuals the FBI was investigating. (Trial Tr. Vol. 4, Brzezinski at 108-114; Vol. 5, Brzezinski at 12-13, 17; Vol. 5, Burnett at 113-14, 116-17, 126-136, 147-48.) Lou Fitzner testified that he received approximately $14,000 for relocation costs and another $1,000 to pay off fines and court costs from unrelated cases so he could move (presumably to avoid warrants from being issued while he was out of state). (Trial Tr. Vol. 16, Fitzner at 104-06.) Gerald Peters received approximately $11,000 for relocation costs and another $10,000 to pay off bills and other expenses so he could be relocated. (Trial Tr. Vol. 13, Peters at 158-60.) The only witness money that was not associated with relocation expenses, or the cost of maintaining a lifestyle while working for the government, was the $25,000 paid to Burnett as a bonus in the Viramontez case.

### (iii)    Rule 11 Plea Agreements Are Not Required

Without supporting authority, Defendants argue that the government committed misconduct by not entering into plea agreements with cooperating Defendants prior to trial. There is no requirement that the government do so.  More importantly, as discussed above, Defendants had ample opportunity during cross-examination of Agent Brzezinski and each of the cooperating Co-Defendants and witnesses to explore before the jury whether the government had made any promises or agreements concerning charges against them, thus allowing defense counsel to show bias and motive and the jury to assess credibility.

### (iv)    Co-Defendant Chris Miller's Testimony Was Not Coerced

This Court is unpersuaded by Defendants' argument that Co-Defendant Chris Miller's testimony at trial was improperly coerced because the government erroneously informed him pre-trial that he was facing a charge that carried a fifteen to twenty-year statutory maximum term of imprisonment and Miller learned during trial that he was facing a charge that carried a three-year statutory maximum.  (Trial Tr. Vol. 13, Miller at 5, 60-64, 80-81.) Defendants' argument ignores that statutory maximums set the upward limit on sentences but the range set by the Sentencing Guidelines is a critical factor in sentencing.  More importantly, Defendants' argument ignores Chris Miller's testimony that he voluntarily cooperated with the FBI, admitted his own criminal acts, gave statements about HMC criminal activity, returned to Michigan to testify at trial, and testified despite confusion about the charges and possible sentence he faced.  (*Id.* at 13-14, 36-38.)

### (v) No Need to Re-litigate Government's Motion *in Limine* Re: Daniel Sanchez

Defendants seek to re-litigate this Court's decision to grant the government's pre-trial

motion *in limine* concerning Co-Defendant Daniel Sanchez.  Defendants argue that the Court improperly shielded cooperating Defendant Daniel Sanchez from cross-examination regarding his admitted participation in a murder at a HMC Detroit clubhouse and the subsequent arson of the clubhouse in an attempt to conceal that murder.  For the reasons stated here, the Court rejects Defendants' argument that there is a need to revisit this issue.

On March 17, 2010, the government gave notice to Defendants that Daniel Sanchez would be called as a witness and provided them with a copy of the FBI 302 from Sanchez's November 2007 debriefing.  The details regarding the murder were redacted since it is still an open investigation.  The government did provide the following notice concerning the redacted portion of the report:

> During a *Kastigar* debriefing in November 2007, Daniel Sanchez admitted to participating in a murder at the Highwaymen Detroit Clubhouse and the subsequent arson of that Clubhouse in an attempt to conceal that murder.  He implicated Anthony Clark and Leonard "Dad" Moore in the murder and subsequent arson.  The government will not be seeking to elicit any of this information from Sanchez during his testimony and will object to its introduction during cross-examination of Sanchez.

(Gov't Suppl. Resp. at 2.)

The government then filed a motion *in limine* on April 3, 2010 [Docket No. 1392], asking the Court to restrict the defense's cross-examination about this murder under Federal Rule of Evidence 608(b).  At the April 6, 2010 hearing on the motion, Defendants Nagi, Ball, Cicchetti, and Whiting opposed the government's motion.  Defendants Dad Moore and Clark joined in the government's motion.  The Court held that evidence concerning this murder was excludable under Rule 608(b) and found the Second Circuit's ruling in *United States v. Flaharty*, 295 F.3d 182, 190-91 (2d Cir. 2002), to be directly on

point. The Court's ruling was reaffirmed during Daniel Sanchez's testimony when a bystander, the mother of a victim allegedly killed by HMC members, ran from the courtroom after shouting, "They killed my son. He killed my son." (Trial Tr. Vol. 18 at 14-22; Vol. 19 at 1-16.) The mother was brought back into the courtroom and questioned outside the presence of the jury. She testified that Defendant Whiting spoke to her niece, Co-Defendant Delilah Whitehouse, to let her know that Sanchez was getting immunity for her son's murder and would be in court that day. The Court instructed the jury to disregard this woman's outburst.

> Ladies and gentlemen, I'm sorry about the outburst in the courtroom. Sometimes people get emotional for one reason or another, and that's what happened here. I instruct you that you are to disregard anything that you heard or think you may have heard from the woman in the benches there. Obviously, it's not evidence, it's not anything that is part of this trial, and we're going to go on with that excluded.

(Trial Tr. Vol. 18 at 22.)

Defendants' arguments here concerning the issue of admissibility of the murder involving Daniel Sanchez, Dad Moore, and Anthony Clark simply restate those previously made and rejected by the Court. Defendants once again argue that, by precluding cross-examination on this murder, the Court has denied them the opportunity to test Daniel Sanchez's motivation for testifying. (*Id.*) The Court did not find the argument persuasive at the earlier hearing and does not find it any more persuasive simply because it is being repeated. The Court reaffirms its earlier finding that the Second Circuit's decision in *Flaharty* is directly on point. In *Flaharty*, the district court precluded the cross-examination of a government witness regarding that witness's commission of a homicide, ruling that evidence of the murder did not reflect on the truthfulness or untruthfulness of the witness.

17

295 F.3d at 190-91. In affirming the conviction, the *Flaharty* court observed that "[u]nder Federal Rule of Evidence 608(b), the district court may restrict cross-examination about specific instances of prior conduct if it finds that the conduct is not probative of truthfulness," and held that "murder generally is not a crime of dishonesty, and nothing about the Evans murder suggested that it would in any way reflect on [the witness]'s truthfulness." *Id.* at 191.

The Sixth Circuit has similarly failed to see the connection between violent crimes and a witness's capacity for truthfulness or untruthfulness and has precluded cross-examination under Rule 608(b). *See United States v. Perkins*, Nos. 96-5337, 97-6452, 1999 WL 506980, *5 (6th Cir. June 7, 1999) (holding that evidence of an armed robbery was inadmissible under the rules of evidence and observing that "evidence attacking a witness's credibility is only admissible if it is probative of the witness's character for truthfulness or untruthfulness," that "[a]rmed robbery does not involve fraud, deceit, or the telling of a falsehood," and that "[d]efense counsel offers no case in which a violent crime was allowed into evidence to prove untruthfulness."). *See also United States v. Thomas*, 105 F. App'x 773, 785 (6th Cir. 2004) (citing *Flaharty* and *Perkins* with approval and affirming the district court's ruling that evidence of a witness's "shootout with the police did not have any bearing on his character for truthfulness or dishonesty" and was thus properly excluded from trial).

### b. Government's Proofs at Trial

The Court now addresses Defendants' arguments regarding the government's proofs at trial, beginning with Defendants' argument that the government, in an effort to taint the jury, improperly proceeded to trial on several charges that it knew it could not prove and

ultimately dismissed at the close of the government's case-in-chief.

### (i) Government's Dismissal of Some Charges Not Misconduct

Defendants argue that the government committed misconduct by proceeding to trial (1) against Ball, Jr. and Cicchetti on Count 13 and related Racketeering Act 12 and Count 14 and related Racketeering Act 13 which charged, respectively, conspiracies to murder Doug Burnett and Phil McDonald "knowing that these charges could not be sustained;" and (2) against Joseph Whiting on Racketeering Act 8 charging him with transporting and receiving a stolen vehicle when it knew there was no evidence that Whiting was in Myrtle Beach. Defendants further argue that the government committed misconduct in its opening statement by poisoning the minds of the jurors by portraying all six Defendants as willing to engage in or conspiring with others to commit violent acts, including the intended murder of a witness, when it knew it could not prove the conspiracy to murder charges against Defendants Ball Jr. and Cicchetti. (Jt. Mot. at 2-5.) The Court rejects Defendants' arguments that the government committed prosecutorial misconduct by knowingly presenting false evidence to the jury, proceeding to trial on charges that it knew it could not prove, or otherwise making remarks that tended to mislead the jury and prejudice Defendants.

The Sixth Circuit standard for claims of prosecutorial misconduct is as follows:

> In the evaluation of a claim for prosecutorial misconduct, it is not enough that the prosecutor's comments were improper, but the relevant question is whether the prosecutors' [sic] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. In other words, in order to satisfy the standard for prosecutorial misconduct, the conduct must be both improper and flagrant.

*Goff v. Bagley*, 601 F.3d 445, 480 (6th Cir. 2010) (internal quotation marks and citations

omitted).  When determining whether improper conduct is flagrant, the court considers the following four factors:

> (1)  the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.

*Id.* (quoting *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005)).  Defendants have not met this standard.

Defendants have not shown that it was improper for the government to proceed to trial on the challenged charges or to refer to them in its opening statement.  The government had (and timely produced to Defendants) statements from witnesses like Chris Miller, Robert Burton, John Barnett, and Michael Toney, who provided information about HMC attempts to find and kill both Doug Burnett and Phil McDonald.  Michael Toney had brain surgery prior to trial, and John Barnett suffered a stroke.  Several months before trial, these two witnesses, their attorneys, and the government stipulated that competency evaluations were in order.  The government anticipated that these evaluations would be completed early enough to allow Barnett and Toney to testify at trial.  That did not occur.

As to witnesses Miller and Burton, the government responds that it proceeded to trial anticipating that they would repeat what was said during their interviews about the attempts to find and kill Doug Burnett and Phil McDonald.  That did not occur.  The government made no effort to lead them, to coerce them during recesses, or otherwise "prompt" their testimony.  Rather, the government let the testimony come out as it did, reviewed it at the conclusion of its case, and acted accordingly in moving to dismiss certain charges against certain Defendants prior to the case being submitted to the jury.

20

The government further responds that it also proceeded to trial with the challenged charges because it believed it had enough circumstantial evidence from other HMC members to do so. All HMC witnesses testified that snitches were not tolerated. (*e.g.*, Trial Tr. Vol. 12, C. Miller at 34-43, 51-52.) Many of the telephone calls and search warrant exhibits detail HMC efforts to locate informants. Chris Miller testified that he was warned that if he was a snitch, he'd "wind up in a dumpster." (Trial Tr. Vol. 12, C. Miller at 48-49.) Daniel Sanchez testified that there was zero tolerance for snitches in the HMC and that punishment could range from being kicked out of the HMC to being killed. (Trial Tr. Vol. 18, Sanchez at 58, 62-63.)

The government's challenged conduct cannot be characterized as improper or flagrant and thus does not constitute prosecutorial misconduct. The same is true with regard to the government's conduct in proceeding to trial and presenting evidence against Defendant Whiting on RICO Count I and alleging in Racketeering Act 8 that Defendant Whiting had received a motorcycle stolen from South Carolina: charges on which the jury found him guilty.

### (ii) Government Did Not Improperly Introduce Uncharged Conduct Evidence

Defendants also argue that there was prosecutorial misconduct because the government improperly introduced uncharged conduct evidence, i.e., unlicensed, on-premises gambling and alcohol sales at the HMC clubhouses, and further argue that this constituted substantial error, which was further increased by the outburst from a courtroom spectator during Daniel Sanchez's testimony. (Jt. Mot. at 3-4.) Defendants' arguments are not persuasive. First, as discussed above, the spectator outburst was, according to her testimony, instigated by Defendant Whiting; not the government. Second, evidence about

21

uncharged acts, like the unlicensed gambling and alcohol sales at issue here, is permissible to show the existence, scope, and nature of the enterprise in a RICO case. *See United States v. Matera*, 489 F.3d 115, 120 (2d Cir. 2007) (observing that evidence of uncharged murders is admissible "to prove an essential element of the RICO crimes charged – the existence of a criminal enterprise in which the defendants participated"); *United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (observing that "[i]t is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise."). The government similarly introduced evidence of uncharged acts to establish the existence of a criminal enterprise in a RICO case. Accordingly, there is no prosecutorial misconduct or substantial error.

### 3. Conclusion

For the above-stated reasons, Defendants have not satisfied their Rule 33 burden of establishing the need for a new trial.

The Court now addresses Defendants' Rule 29 arguments for acquittal.

### B. Rule 29 Motions for Acquittal

Defendants next challenge the sufficiency of the evidence of their convictions under Federal Rule of Criminal Procedure 29. The Court begins with the standard of review, then addresses Defendants' shared arguments, and finally their individual arguments.

### 1. Standard of Review

"Evidence is sufficient to sustain a conviction if after viewing the evidence in

the light most favorable to the prosecution, *and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony*, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *United States v. Driver*, 535 F.3d 424, 428-29 (6th Cir.) (internal quotation marks and citations omitted, emphasis in original), *cert. denied*, 129 S. Ct. 662 (2008). "In examining claims of insufficient evidence, this court does not weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id.* (internal quotation marks and citation omitted).

## 2. No Variance Between the Indictment and Trial Evidence

In their Joint Motion, Defendants argue that the Court allowed the government a prejudicial variance from the Second Superseding Indictment because the Indictment charged one large racketeering conspiracy but the government's trial evidence proved only several separate drug conspiracies involving HMC members.[1] Specifically, Defendants argue that the government failed to tie the drug conspiracies charged in Racketeering Acts 9, 10, and 11 to the RICO enterprise identified in Count 1 of the Indictment charging a substantive RICO violation. This joint argument challenges the sufficiency of the

---

[1]To the extent Defendants are arguing there was insufficient proof to establish a RICO enterprise, that argument is rejected. There was substantial evidence submitted at trial establishing this element of the RICO charge. Moreover, as the Court instructed the jury, it is not illegal in and of itself to be a member or associate of the HMC. Nonetheless, there was sufficient evidence at trial establishing that a large number of the Detroit area HMC members had associated together and formed an on-going organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise. In short, the evidence showed that the enterprise was a criminal organization that evolved out of the HMC; it was not the HMC.

government's proofs at trial and is thus analyzed under Rule 29.[2]

Count 1 of the Indictment charged a substantive RICO violation and included Racketeering Acts involving three separate drug conspiracies. These Racketeering Acts were incorporated into Count 2 – the RICO conspiracy count. Contrary to Defendants' arguments here, evidence at trial was sufficient to show that the drug trafficking activity in Racketeering Act 9 (evidence regarding the Robert Burton drug conspiracy), Racketeering Act 10 (evidence regarding the Jeffrey Miner/Phil McDonald steroid drug conspiracy),[3] and Racketeering Act 11 (evidence regarding the Aref Nagi drug conspiracy) was related to and an integral part of the HMC enterprise and its activities.

For example, ample trial evidence exits showing that members of the HMC sold to or distributed/shared drugs with other members. (*See, e.g.,* Trial Tr. Vol. 18, D. Sanchez at 27-30, 32-33.) The record is replete with testimony about HMC members sharing cocaine with Defendants (*e.g.*, references to "Scooby Snacks," "Scooby Meals," and "Dad Packs").

---

[2]As explained by the Sixth Circuit, "[a] variance [to the indictment] occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Solorio*, 337 F.3d 580, 589 (6th Cir. 2003) (internal quotation marks and citation omitted). "A variance will not constitute reversible error unless substantive rights of the defendant have been affected," and "a substantive right of the defendant is violated by a variance only when a defendant proves prejudice to his ability to defend himself or to the overall fairness of the trial." *Id.* at 590 (internal quotation marks and citations omitted).

Just as in *Solorio*, Defendants here have not shown a prejudicial variance because "[t]he facts adduced at trial were not materially different from those alleged in the indictment." *Id.* As the *Solorio* court observed, "[t]he concept of variance is designed to prevent the prosecution from convicting the defendant of a different offense, not a lesser variation on the charged offense." *Id.* Defendants have not shown that they were convicted of different offenses than the ones charged in the Second Superseding Indictment.

[3]Trial Tr. Vol. 19, McDonald at 33.

There is abundant evidence that the HMC condoned drug trafficking and drug use despite language to the contrary in its constitution. It was a common occurrence to have drug deals and drug use at the HMC clubhouse. The HMC leaders like godfather Dad Moore and National President Whiting did not stop it. Rather, they freely shared the cocaine distributed inside the clubhouse. (*See, e.g.,* Trial Tr. Vol. 7, Burton at 76; Vol. 19, D. Sanchez at 82-83; Vol. 18, D. Sanchez at 37, 42-44, 46-55.) Witnesses also testified that other present and past HMC officers, committee members, and honoraries, like Defendants Clark, Cicchetti, Nagi, and Ball Jr., shared the cocaine that they frequently distributed to each other as well as that provided by other HMC members who dealt drugs at the clubhouse. There was also evidence that HMC leaders used other HMC members for protection, to collect drug debts, and to assault people who "stiffed" them on drug deals. Thus, there was ample evidence that HMC officers, members and associates used the HMC clubhouses to facilitate the sale and distribution of controlled substances. All of this was alleged in the Indictment and proven at trial. There was no variance.

Moreover, evidence was presented showing that drug sales were the primary source of income for many of the HMC members. It was thus reasonable for the jury to infer that drug proceeds were used to pay HMC club dues, taxes, fees, penalties, club expenses, and to fund a bail/legal defense fund. In fact, Doug Burnett testified that he did just that – he used his drug proceeds to pay his HMC club dues. (Trial Tr. Vol. 5, D. Burnett at 74-75.) Accordingly, similar to the observation the Sixth Circuit made in *United States v. Lawson*, 535 F.3d 434, 445 (6th Cir. 2008), when a considering a RICO conspiracy charge against a member of the Outlaws motorcycle club, "[o]ne can infer from that evidence that [the HMC] facilitated such endeavors so that the profits could be used to finance the [HMC]'s

25

activities." *Id.*

### 3. Individual Rule 29 Arguments

#### a. Defendant Clark

Defendant Anthony Clark was convicted on the RICO conspiracy count (Count 2 of the Indictment). His Rule 29 motion argues that there is insufficient evidence to prove that he agreed that someone would commit two of the Racketeering Acts alleged in Count 1 of the Indictment.

"To prove a RICO conspiracy charge, it is not necessary to show that the defendant committed two predicate acts himself or agreed to commit two predicate acts himself." *United States v. Driver*, 535 F.3d at 432. Rather, a "RICO conspiracy conviction can be sustained if there is evidence sufficient to prove that [the defendant] agreed that *someone* would commit two predicate acts." *Id.*

First, as an initial matter, the Court rejects Clark's argument that his acquittal on Count 1, Racketeering Acts 6 and 9, and Count 17 compels the conclusion that no reasonable jury could find that he committed the predicate drug conspiracy acts (Racketeering Acts 9, 10, and 11). *See United States v. Harris*, No. 07-10143-JTM, 2009 WL 4059388, *8 (D. Kan. Nov. 20, 2009) (rejecting a similar argument, quoting an Eleventh Circuit decision, *United States v. Russo*, 796 F.2d 1443, 1462 (11th Cir. 1986), which held that "the jury could have found that [the defendant] agreed to participate in the enterprise through the commission of two predicate acts without finding that he actually committed the two predicate acts.").

Second, despite Clark's arguments to the contrary, there is sufficient evidence to tie him to the drug conspiracies alleged in Racketeering Acts 9 and 11. There is sufficient trial

evidence to show that Clark conspired with Daniel Sanchez and others to purchase cocaine and provided that cocaine to other HMC members, sometimes for their own use (*e.g.*, Whiting) but more often to sell/distribute to the general public (*e.g.*, D. Sanchez and BJ) – the predicate act alleged in Racketeering Act 9.[4] (Trial Tr. Vol. 18, Sanchez at 27-30, 32-33, 42; Vol. 7, Burton at 82-83, 85-86; Vol 13, G. Peters at 13; Vol. 20, McDonald at 108-09, 118-19; Gov't Ex. 12.) From this, it can be inferred that Clark had entered into an agreement with others to violate RICO by conspiring to distribute cocaine (Racketeering Act 9). *See United States v. Lawson*, 535 F.3d at 445 (observing, under similar circumstances, that even absent direct evidence, an "agreement [to violate RICO] can be inferred from [the defendant's] acts.").

The same is true of Racketeering Act 11. Evidence that Nagi and Ball, who are named in the drug conspiracy described in Racketeering Act 11,[5] shared drugs with the

---

[4]Racketeering Act Nine (Conspiracy to Distribute Cocaine) alleges that:

In or about 2000 through in or about 2007, in the Eastern District of Michigan, defendant Anthony Clark, and others, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree to commit an offense against the United States, that is, to distribute more than five kilograms of cocaine, a Schedule II controlled substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

Second Superseding Indictment, Count One.

[5]Racketeering Act Eleven (Conspiracy to Distribute Controlled Substances) alleges that:

From in or about 2004 through the date of this indictment, in the Eastern District of Michigan, defendants Aref Nagi, Gary Ball Jr., and others, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with each other to commit offenses against the United States, that is, to distribute more than five kilograms of cocaine, as well as marijuana, Vicoden, Viagra, Ecstacy, and other controlled substances; in violation of

leadership of the HMC at HMC clubhouses, that Clark held leadership positions in the HMC during the time of the alleged conspiracy, and that the leadership condoned and never condemned the drugs use/sales/distribution in the HMC clubhouse is sufficient to allow a reasonable jury to infer that Clark had implicitly agreed that Nagi or Ball Jr. would conspire with others to distribute controlled substances – Racketeering Act 11. (Trial Tr. Vol. 7, B. Burton at 85-91; Vol. 17, N. Sanchez at 14, 17; Vol. 18, D. Sanchez at 37; Vol. 13, C. Miller at 66-67.) Similar to *Lawson*, the evidence presented in this case shows that when Clark served in various leadership roles, *i.e.*, as national president, chapter president, an honorary, or committee member, the HMC "was an organization that encouraged its members to engage in the drug trade." *Lawson*, 535 F.3d at 445. During the period of time alleged in Racketeering Act 11, Defendant Clark attempted to purchase cocaine and brought his workers to the HMC Clubhouse so they could purchase cocaine – acts from which a reasonable jury could infer that Clark agreed that Nagi, Ball Jr. and others would distribute controlled substances. (Trial Tr. Vol. 5, D. Burnett at 89-90; Vol. 6, D. Burnett at 7.) As the Sixth Circuit recently observed in *Driver*, "[p]roof of a formal agreement is not required to establish a conspiracy; a tacit or material understanding among the parties is sufficient." *Driver*, 535 F.3d at 429 (internal quotation marks and citations omitted). A "RICO conspiracy conviction can be sustained if there is evidence sufficient to prove that [the defendant] agreed that *someone* would commit two predicate acts." *Id.* at 432.

**b. Defendant Dad Moore**

---

Title 21, United States Code, Sections 841(a)(1), and 846.

Second Superseding Indictment, Count One.

Defendant Leonard "Dad" Moore was convicted on the RICO conspiracy count (Count 2 of the Indictment). His Rule 29 motion argues that there is insufficient evidence to prove that he agreed that someone would commit two of the Racketeering Acts alleged in Count 1 of the Indictment. This Court disagrees.

First, numerous witnesses testified that Dad Moore was the "godfather" of the HMC, was in the top leadership position, was a member of the "committee" that governed HMC activities, and was keenly aware of and had a large say in the affairs of the HMC enterprise. (*e.g.*,Trial Tr. Vol. 13, Peters at 100-05; Vol. 18, Sanchez at 11-12; Vol. 7, B. Burton at 70-71; Vol. 5, D. Burnett at 64-65, 67.)

Second, there is abundant testimony that Dad Moore was not only aware of but frequently shared the cocaine that was distributed to him by HMC members involved in the drug conspiracies alleged in Racketeering Acts 9 and 11, i.e., Clark, Daniel Sanchez, Bobby Burton, Nagi, and Ball Jr. Despite being looked to as the "godfather" of the HMC, Dad Moore never condemned the sale, distribution, or use of cocaine in the HMC clubhouse. Rather, he facilitated the drug conspiracies alleged in Racketeering Acts 9 and 11 by frequently using the drugs that were commonplace in the HMC clubhouse and distributed to him by Bobby Burton, Ball Jr., Whiting, Cicchetti, and Clark among others. In fact, Nat Sanchez testified that whenever he got ready to go to the Detroit clubhouse, he would get his cocaine ready to sell by bagging and packing it up, but he "kept an extra pack," that he "was going to give away" that he called "a Dad Pack because [Sanchez] would give [Dad Moore] most of it, you know, just to stay on his good side." (Trial Tr. Vol. 17, N. Sanchez at 16.) (*See also*, Trial Tr. Vo. 7, B. Burton at 76, 80, 85-91, 99; Vol. 17, N. Sanchez at 14-16, Vol. 5, D. Burnett at 82-83; Vol. 12, C. Miller at 11-16; Vol. 13, G.

Peters at 109-110,133-34.)

    **c.  Defendant Whiting**

Defendant Whiting argues that there is insufficient evidence to convict him on all charges involving the conspiracy to murder Doug Burnett and the charges involving his receipt of a stolen vehicle; i.e., Count 1 - Racketeering Act 8 (stolen motorcycles from Myrtle Beach) and Racketeering Act 12 (Doug Burnett), Count 2 - RICO conspiracy, Count 13 (Doug Burnett), and Count 47 (receipt of stolen motorcycle).

Specifically, as to the charges involving a conspiracy to murder Doug Burnett, Whiting argues that the government failed to prove the existence of a conspiracy or any intent to kill, did not meet its burden in refuting Whiting's entrapment argument, created a prejudicial variance between the murder conspiracy charged in the Indictment and the government's proofs at trial by arguing that a conspiracy existed between Whiting and Anthony Viramontez of the Latin Counts, and violated *Brady* and the Jencks Act, 18 U.S.C. § 3500 by not providing Defendants with a FBI 302 report and internal Threat Assessment Report from the Viramontez criminal matter until after the government rested its case-in-chief on May 20, 2010.

As to the charges involving Whiting's receipt of a stolen motorcycle, Whiting argues that the government presented insufficient evidence that the motorcycle Phil McDonald testified that Whiting showed him was one of the motorcycles stolen from Myrtle Beach, South Carolina and transported to Michigan and that Whiting received a stolen motorcycle that had a motor and was not merely a bike frame.  This Court disagrees with Whiting on each of these arguments.

First, applying the Rule 29 standard, there was sufficient evidence that a conspiracy

existed to murder Doug Burnett, that the conspiracy existed between Anthony Viramontez and Whiting, that there was an intent to kill Doug Burnett, and Whiting was not entrapped. The jury heard, multiple times, an August 16, 2006 recorded conversation between government informant Phil McDonald and Whiting. Mr. McDonald testified about this conversation and was extensively cross-examined about it. Agent Brzezinski was also subjected to extensive cross-examination on this topic. There was evidence that, prior to the August 16, 2006 conversation, both Anthony Viramontez and Whiting (along with other HMC members) strongly suspected that Doug Burnett was a snitch. Viramontez told McDonald about his suspicions about Burnett, told him that Doug Burnett had to go and would not be around to testify at any Viramontez trial, and confided that, because Burnett was a member of the HMC and Viramontez and the Latin Counts did not want to provoke a battle between the HMC and the Latin Counts, Viramontez wanted McDonald to talk to Whiting about taking care of Doug Burnett and to see if Viramontez could find and kill Doug or if the HMC wanted to take care of it. (Trial Tr. Vol. 20, McDonald at 4-6, 30, 62-70, 85.)

Q: That was Government Exhibit 98. . . . Now, that occurred on August 16, 2006, is that correct?

A: Yes.

Q: Prior to that conversation with Mr. Whiting, had you had any conversations with Mr. Viramontez about the potential snitch?

A: Yes.

Q: And who had he identified as a snitch?

A: Doug Burnett.

Q: And did he tell you what his plans were for Doug?

A: Yeah, he had, you know, he had talked to me about us and the club either

31

getting rid of him, or he was going to do it if he seen him, but he wanted me to talk to Joe about it. Then he changed his mind, and then he said do it again, but he definitely wanted Dougie found and gone.

Q: And when you say gone, what was Mr. Viramontez taking about being gone?

A: Killed.

Q: Why did Mr. Viramontez want you to go to Joe Whiting about that?

A: Because Joe was the national boss.

Q: And why is that important?

A: Well, so you don't step on nobody's toes.

Q: And what would happen if it was perceived that, you know, someone's toes were being stepped on?

A: Could potentially put a war between Latin Counts and Highwaymen.

(Trial Tr. Vol. 20, McDonald at 4-5.)[6]

A reasonable jury could infer from both the recorded conversation between McDonald and Whiting (Gov't Ex. 98) and McDonald's testimony that Whiting gave Viramontez the okay to kill Doug Burnett and also told the HMC members that if anyone found Doug Burnett, he was to be killed.

Q: We heard reference during the recording to not – make sure he's not wearing his club shit. What did that mean?

A: Well, if Tony and them got to him first, that way it didn't look like he was a Highwaymen or, you know, if they said that Latin Counts did it, it didn't look like there was any issue against Highwaymen, Latin Counts.

Q: After this conversation with Joe on August 16, 2006, did you have other conversations with Joe about Doug Burnett?

---

[6]This testimony directly contradicts Defendant Whiting's argument that the government concocted the conspiracy between Whiting and Viramontez without Viramontez ever suggesting that Whiting be involved.

A:  Yes.

Q:  What else did Joe tell you concerning Doug Burnett?

A:  That he was nowhere to be found and, you know, he needed to go if anybody found him.

Q:  Did Joe Whiting put anything out at any of the meetings concerning what the Highwaymen were supposed to be doing in regard to Doug Burnett?

A:  Yeah, everybody look for him, anybody finds him, get his ass.

* * *

A:  Anybody finds him, get him, kill him.

Q:  Based upon your experience in the club and your conversations with Joe Whiting, if they would have found Doug Burnett, what would have happened to him that summer?

* * *

A:  He would have been killed.

(*Id.* at 5-6.)  McDonald testified that, before this August 16, 2006 conversation, Whiting and other HMC members suspected that Doug Burnett was an informant or snitch and wanted to kill him.  (*Id.* at 30, 66, 70, 85.)  He also testified that he "didn't make [Whiting] say it's okay to kill Doug," (*id.* at 78); rather, he was telling Whiting what Viramontez had said about Doug being a snitch and Whiting responded basically that he did not care if Viramontez got rid of Doug Burnett.  (*Id.* at 80.)  This evidence is sufficient to refute Whiting's entrapment defense.

Defendant Whiting also argues that (1) the government created a prejudicial variance by submitting proofs at trial about a conspiracy to murder Doug Burnett that involved Whiting and Anthony Viramontez of the Latin Counts; and (2) the government violated *Brady* and the Jencks Act by failing to provide a FBI 302 report and an internal Threat

33

Assessment Report about Doug Burnett generated in the Viramontez criminal matter until after the government rested its case-in-chief. The Court first examines Whiting's variance claims.

There is no variance. Racketeering Act 12 of Count 1 in the Second Superseding Indictment and the Redacted Indictment submitted to the jury without any defense objections alleges that Whiting and "others" conspired to murder Doug Burnett. This is sufficient to include the proofs at trial that Whiting conspired with Anthony Viramontez to murder Doug Burnett.

As to Count 13, Whiting raised an argument for the first time at the September 7, 2010 motion hearing. Specifically, Whiting argued that, although Count 13 of the Redacted Indictment contained the "and others" language reflected in Racketeering Act 12 of Count 1, the language in the Second Superseding Indictment did not and thus created a prejudicial variance between the Second Superseding Indictment and the government's proofs at trial. The government responded by arguing that failure to include the "and other" language in the Indictment did not create a prejudicial variance, offered to provide case law supporting that argument, and has provided a supplemental memorandum on the issue [1572]. This Court finds the government's argument persuasive. There is no variance.

In *United States v. Pingleton*, 216 F. App'x 526 (6th Cir. 2007), the Sixth Circuit Court of Appeals addressed an issue similar to the one presented here. There, the indictment charged two specific individuals with agreeing to commit a drug offense, but the proofs at trial identified a third individual not named in the indictment. Similar to here, the indictment did not contain the language "and others known and unknown." *Id.* at 259. The defendant argued that "when the district court allowed the government to introduce evidence of a

conspiracy involving other persons, this was an impermissible 'constructive amendment' of the indictment." *Id.* at 258-59. The *Pingleton* court held that, although the lack of the "and others" language was atypical and should not be done in future indictments, "under the circumstances of this case," there was no variance or constructive amendment of the indictment and "the indictment should be read to charge a conspiracy involving two *or more* persons." *Id.* at 259 (emphasis in original). The circumstances that the Sixth Circuit relied upon to justify the result in *Pingleton* are also present here, *i.e.*, (1) the government had provided the defendant "with discovery evidence indicating that the charged conspiracy was not limited to him and [the individual named in the indictment]," *id.*, (2) the defendant had "notice that the charged conspiracy included co-conspirators beyond [the individual named in the indictment]," *id.*, and (3) "not to construe this indictment to charge a conspiracy involving two or more persons might create tension with the general rule that the prosecution need not furnish co-conspirators' names as long as the defendant had notice of the conspiracy with which he is charged." *Id.*

In this case, the government provided notice to Defendant Whiting that Anthony Viramontez was part of the conspiracy to murder witness Doug Burnett. As pointed out at the motion hearing and evidenced in the government's exhibit to its supplemental response, testimony regarding the conspiracy to kill Doug Burnett, Viramontez, and Whiting was elicited at a May 2009 detention hearing in this criminal matter in which Whiting's counsel was present and cross-examined Agent Brzezinski. (9/8/10 Suppl. Resp., Ex. 2, 5/28/09 Det. Hrg. Tr. at 65-79.) In addition, on July 2, 2009, well in advance of trial, Defendant Whiting was provided extensive discovery materials. These materials included at least 32 FBI "SOI" or source of information reports in which Viramontez was mentioned and

specifically referenced the July 27, 2006 FBI 302 report that involved the conspiracy to kill Doug Burnett. (9/8/10 Suppl. Resp., Ex. 3, Discovery Index.) Moreover, although Count 13 of the Second Superseding Indictment did not contain "or others" language, the related Racketeering Act 12 in Count 1 did. Finally, as the Sixth Circuit observed in *Pingleton*, "not to construe this indictment to charge a conspiracy" involving others "might create tension with the general rule that the prosecution need not furnish co-conspirators' names as long as the defendant has notice of the conspiracy with which he is charged." *Pingleton*, 216 F. App'x at 529. For all these reasons, there is no variance requiring acquittal.

Likewise, there is no *Brady* or Jencks Act violation. This issue was fully litigated on May 20, 2010. (Trial Tr. Vol. 25.) After hearing from Whiting's counsel and the government, the Court ruled as follows:

> Defense may recall Agent Brzezinski for any additional cross examination you feel is necessary with respect to this. I'm satisfied based on the 302 that the information was provided to the FBI on July 27, 2006. That's the date of the investigation as the 302 confirms the date of the conversation with Mr. McDonald, and I do not believe it necessary to recall Mr. McDonald.

> * * *

> I understand your argument, that if you had this information you would have gone into more with Mr. McDonald about it when he was on the stand, but he's not available to bring back at this time, and frankly, given the self-authenticating nature of the 302 that was provided to counsel as part of the discovery in this case, I don't think it's necessary to recall Mr. McDonald.

> * * *

> Let me just say again for the record, the 302 indicating when the FBI had contact with Mr. McDonald and Mr. McDonald provided the information about the Viramontez threat was provided as part of the discovery in this case, so defense did have the time sequencing provided, but the only thing that was not provided was the information in the threat assessment that was provided this morning which stated that Mr. Viramontez had gone out looking for Doug Burnett. In terms of the time sequencing, that was in fact provided. I'm not saying that the

government shouldn't have provided the additional paragraph that they provided this morning concerning Mr. Viramontez going out looking for Mr. Burnett. I believe that was inadvertent since the other information from the threat assessment was provided, but given this new paragraph that you had this morning, I certainly think it's appropriate to recall Agent Brzezinski and give you the opportunity to cross examine him on it.

(Trial Tr. Vol. 25 at 14-16.)

Whiting's counsel then cross-examined Agent Brzezinski. Agent Brzezinski confirmed that on July 27, 2006, Phil McDonald informed the FBI that Viramontez told him that he believed Doug Burnett was the snitch, that he wanted to kill him, but was not going to do so because he didn't want a war with the Highwaymen. He also confirmed that on August 3, 2006, he prepared a threat assessment report for the Viramontez file stating that Viramontez told McDonald that he had some guys follow Dougie Burnett to find out where he lived. Agent Brzezinski further testified that once Whiting, the National President of the HMC, gave the go ahead on August 16, 2006, the threat on Doug Burnett's life became more serious because there was no longer any concern about a war with the Highwaymen if Viramontez killed Doug. (*Id.* at 18-28.)

As shown above, this *Brady*/Jencks Act issue was previously addressed, and there is no need to re-litigate it.

The Court also rejects Whiting's argument that there is insufficient evidence to support his conviction for receipt of a motorcycle that had been stolen from South Carolina and transported to Michigan. Phil McDonald testified that, on August 16, 2006, Whiting showed him his motorcycle, and McDonald knew that this was a motorcycle that was stolen from Myrtle Beach, South Carolina. Whiting was working on the bike and told McDonald that once he was done working on the motor he'd bring it out. (Trial Tr. Vol. 20, McDonald at

6, 8, 60-61, 87-95; Gov't Ex. 98, 8/16/06 wire-tap.)  When asked why McDonald believed this was a stolen bike from Myrtle Beach, he testified that:

> A:  Well, it didn't have a motor in it, and as you heard Joe talk about, when he got that done, he'd bring it out.  And that's what they do, they take the cases apart and put new ones on, and new MSO's.
>
> Q:  That could be done with any stolen bike, right?
>
> * * *
>
> A:  Yes.
>
> Q:  So my question to you is how did you know that that bike that you saw was a stolen bike from Myrtle Beach and not from anywhere else?
>
> A:  Certain it was.
>
> * * *
>
> Q:  How could you tell that it was not from Toledo, Ohio rather than from Myrtle Beach?
>
> A:  Because I knew they had just stolen a bunch of motorcycles from down there.

(*Id.* at 91-92, 94.)  A reasonable jury could infer from this testimony and other testimony introduced about HMC members stealing motorcycles from Myrtle Beach that Whiting received a stolen motorcycle and was working on it when he showed it to McDonald.

### d.  Defendant Ball, Jr.

In his Rule 29 motion, Defendant Ball Jr. argues that the drug conspiracies alleged in Counts 19 and 20 of the Indictment were multiplicitous and thus his conviction on one of the Counts must be set aside or merged with the other.  Ball Jr. further argues that there is insufficient evidence for the jury to find as it did that he distributed over five kilograms of cocaine.  The government responds that (1) Counts 19 and 20 are merged for sentencing

purposes, but other than that they are two separate and distinct charges; and (2) there is sufficient evidence for a reasonable jury to find that Ball Jr. distributed over five kilograms of cocaine.  The Court addresses the multiplicity argument first.

Count 19 of the Indictment charges Ball Jr. with conspiracy to possess with intent to distribute, and distribution of controlled substances in violation of 21 U.S.C. § 846. Specifically, it alleges that from about 2004 through the date of the Indictment, Defendants Aref Nagi, Michael Cicchetti, Gary Ball Jr., and others, conspired "to possess with intent to distribute, and to distribute, controlled substances, to include over five kilograms of cocaine;" in violation of 21 U.S.C. § 841(a)(1).  The government refers to this as "the Nagi drug conspiracy."

Count 20 of the Indictment charges Ball Jr. with conspiracy to possess with intent to distribute, and distribution of, cocaine in violation of 21 U.S.C. § 846.  Specifically, it alleges that "[i]n or about May 2007 through in or about June 2007," Defendant Gary Ball, Jr., and others, conspired "to possess with the intent to distribute, and to distribute, cocaine, a Schedule II controlled substance," in violation of 21 U.S.C. § 846.  The government refers to this as "the Peters/Robert Whitehouse conspiracy."

Defendant Ball Jr. is correct that "'an indictment may not charge a single criminal offense in several counts' without implicating multiplicity and double-jeopardy concerns." *United States v. Dunn*, 269 F. App'x 567, 573 (6th Cir. 2008) (quoting *United States v. Hart*, 70 F.3d 854, 859 (6th Cir. 1995)).  That, however, is not what occurred here.  As the *Dunn* court observed, "[c]harging a defendant with separate counts for different statutory criminal offenses does not violate the multiplicity rule." *Dunn*, 269 F. App'x at 573.  Even if the multiplicity rule were violated, Ball Jr.'s substantive rights would not be affected because,

as the *Dunn* court observed, merger of the two counts "would have no practical effect on [the defendant's] sentence." *Id.* at 574.

Moreover, there was sufficient evidence to convict Ball Jr. on each. First, as to Count 20, Gerald Peters testified that he set up a cocaine deal between Ball Jr. and Robert Whitehouse. (Trial Tr. Vol. 13 at 132-33; 6/14/07 search warrant for Robert Whitehouse's residence.) Second, as to Count 19, there was sufficient evidence for a reasonable jury to find that Ball Jr. distributed over five kilograms of cocaine. Chris Miller bought two eight-balls from Ball Jr. in February 2007, and in May 2007 saw him with about a kilo and one-half at his home. He also delivered a bag with about $40,000 to $60,000 in it from Nagi and delivered it to Ball Jr. at the HMC clubhouse. (Trial Tr. Vol. 12, Miller at 16-20, 22-23; Vol. 13, Miller at 29-34, 42-48, 82-83). Lou Fitzner testified that on one occasion Ball Jr. and Nagi were at his house breaking down a kilogram of cocaine. (Trial Tr. Vol. 16, Fitzner at 41-42, 64, 118-19.) Fitzner also testified that Ball Jr. distributed cocaine to Nagi and vice versa. (*Id.* at 31.) Nat Sanchez testified that every time he saw Ball Jr. he had "a nice size amount" of cocaine with him – about one-half ounce. (Trial Tr. Vol. 17, N. Sanchez at 17-18.) Bobby Burton testified that he considered Ball Jr. to be a competitor, and Ball Jr. distributed amounts of cocaine similar to him – about a kilogram every two weeks for six years. Burton also testified that he saw Ball Jr. distribute cocaine to other HMC members inside the clubhouse. (Trial Tr. Vol. 7, Burton at 76-79, 89, 90.)

### e. Defendants Cicchetti's and Nagi's Rule 29 Arguments

Defendant Cicchetti filed a Rule 29 motion that Defendant Nagi joined in part. The Court will first address their joint argument that there is insufficient evidence for their convictions on Counts 7 and 31 of the Indictment involving the assault of Alan Kirchoff at

Wheat and Rye on or about December 23, 2005. Specifically, these Defendants argue that (1) as to Count 7, there is insufficient evidence of that Nagi and Cicchetti were inside the Wheat and Rye and were involved in an assault on Alan Kirchoff; and (2) as to Count 31, there is insufficient evidence that either Nagi or Cicchetti aided and abetted the use of a firearm during that assault.

### (i) Wheat and Rye Arguments

As described below, applying the relevant Rule 29 standard of review, there is sufficient evidence that Nagi and Cicchetti were inside the Wheat and Rye and were involved in the assault on Alan Kirchoff and thus their motions as to Count 7 are denied. Count 31 requires more discussion.

As observed by the Sixth Circuit, "[a] defendant may be found to have brandished a firearm under an aiding and abetting theory of liability." *United States v. Franklin*, 415 F.3d 537, 554 (6th Cir. 2005). "[T]o sustain a conviction under [18 U.S.C.] § 924(c) for aiding and abetting, the government must prove 'that the defendant, as the accomplice, associated and participated in the use of the firearm in connection with the underlying . . . crime.'" *United States v. Gardner*, 488 F.3d 700, 712 (6th Cir. 2007) (quoting *Franklin*, 415 F.3d at 554-55). "The government can meet that burden by showing that the defendant both knew that the principal was armed and acted with the intent to assist or influence the commission of the underlying predicate act." *Gardner*, 488 F.3d at 712.

The government presented sufficient evidence to allow a rational jury to convict Defendants Nagi and Cicchetti on Count 31. Evidence was presented from which a reasonable jury could infer that Nagi and Cicchetti were inside the Wheat and Rye during the assault on Alan Kirchoff, that they knew Erick Manners possessed a gun, and that they

acted with the intent to assist or influence the commission of the underlying crime of assault with a dangerous weapon.

Evidence presented at trial shows that on December 22, 2005, Alan Kirchoff was at the Trolley Stop Bar for "Power Hour" that started at 10:00 p.m. While there, Kirchoff got into an altercation and fight with an individual he did not know but was later informed was a member of the Highwaymen. (Trial Tr. Vol. 7, Kirchoff at 13-14.) Kirchoff left the Trolley Stop and went to the Wheat and Rye in Allen Park, Michigan and was assaulted. In his statement to the police, Kirchoff reported that:

> After hanging out for about half hour, a group of about ten people busted in, and I looked at my friends and said here they come. Immediately, I started getting hit from all sides, and when I came to, to look up, Erick [Manners] was standing there saying, do you remember me? . . . . Erick said, remember me, mother fucker? I got hit a couple more times and witnessed Pok-A-Dot put his gun out and point it at me, repeated his self, and I started running. I hopped a couple fences and dialed 911. During this period, after I got up – after I got up and Erick pointed the gun at me, I started running towards the kitchen – . . . . I started running towards the kitchen, and he fired off two shots in the air. Once I made my way into the kitchen, I heard one more shot fired. That's when I left the building and ran for my life.

(*Id.* at 15-16; Gov't Ex. 229E.) Kirchoff signed his statement, which was dated December 23, 2005 at 1:10 a.m. (*Id.* at 13.) Kirchoff recognized Erick Manners by his nickname of Pok-A-Dot and knew that he was a member of the Highwaymen. (*Id.* at 9-10.) He also testified that the mother of his child, Heather Marcetic, dated Leonard "Bo" Moore, Dad Moore's son, and Kirchoff knew that Bo Moore was also a member of the Highwaymen. (*Id.* 10-11.) Kirchoff's 911 call was played for the jury. (*Id.* at 38; Gov't Ex. 229A.)

Lou Fitzner testified that Nagi told him that Nagi, Johnny Jarrell, Erick Manners, and Cicchetti were inside the Wheat and Rye when Erick Manners (Pok-A-Dot) fired a couple shots into the ceiling. Fitzner also testified that there was no way Nagi would stay outside

when a confrontation was going on inside. (Trial Tr. Vol. 16, Fitzner at 44-46.) Daniel Sanchez testified that Pok-A-Dot (Erick Manners) was Nagi's right-hand man. (Trial Tr. Vol. 18 at 52.)

Allen Park Officer Steven Samborski testified that he responded to a report of "shots fired" at the Wheat and Rye. (Trial Tr. Vol. 7, Samborski at 20.) As he approached the Wheat and Rye, he saw a black pick-up truck pull out of the Wheat and Rye parking lot at a high rate of speed. He followed the vehicle and observed a white male exit the vehicle on the driver's side as he was approaching. Then, he saw two other males and a female exit the vehicle. The two males were Nagi and Cicchetti. Officer Samborski found a loaded Glock pistol in a snow bank in the direction the male ran. (*Id.* at 21-24, 34-35; Gov't Exs 229C (pistol) and 229D (bullets).) Nagi and Cicchetti were released without charges; the female driver was arrested for drunk driving. (*Id.* at 30.)

Detective Sergeant Michael Falkner from the Allen Park Police Department also testified about his investigation of the Wheat and Rye assault on Alan Kirchoff. He interviewed Kirchoff on December 23, 2005, observed his injuries, and testified that he appeared to be sober. Alan Kirchoff identified Erick Manners or Pok-A-Dot as the individual who assaulted him. Det. Sgt. Falkner also went to the Wheat and Rye on December 23, 2005, and located and removed two rounds of bullets from the ceiling of the bar in the area pointed out by Alan Kirchoff. It was later determined that the bullets did not come from the Glock recovered in the snow on December 23, 2005. Charges were never brought against Erick Manners because the victim did not cooperate. (Trial Tr. Vol. 7, Falkner at 37-41.)

Along with testimony from Agent Brzezinski, the jury heard several wire-tapped phone conversations discussing the Wheat and Rye incident, efforts to keep Kirchoff from

cooperating with the police, and Nagi's weapons. (*Id.*, Brzezinski at 46-54; Gov't Exs. 27, 40, 42, 43, 44, 46, 48.)

The incident began when Johnny Jarrell called Nagi on December 22, 2005 and told him to come up to the Trolley Stop because there was going to be a problem. Nagi replied that he had six "mother fuckers" with him and agreed to bring them all with him. (Gov't Ex. 42). On December 23, 2005, Nagi and Bo Moore discussed the incident. (Gov't Ex. 43.) As Kirchoff testified, he knew Bo Moore because he was dating the mother of Kirchoff's child, and Kirchoff knew that Bo Moore was a member of the Highwaymen. From the Nagi/Bo Moore call, it appears that Kirchoff visited Bo Moore after the Wheat and Rye incident and told him, "Your boys shot at me, they jumped me and hit me with beer bottles and stuff." (*Id.*) Bo Moore told Kirchoff that he better not pursue charges against Erick Manners or he would be labeled a snitch and groups of the Highwaymen would be out looking for him and that he was going to get hurt bad because two or three of them might have "heaters." (*Id.*) Nagi made several comments to Bo Moore in that conversation from which a reasonable jury could infer that he was inside the Wheat and Rye during the Kirchoff assault. When Bo Moore commented that he "would have loved to had been there when Pok-A-Dot started busting them caps, watching them motherfuckers screaming and hollering and jumping and running," and Nagi responded, "Well he was bucking first. . . . He was bucking with him first. . . . Yeah. Then it was like, fuck, it was fuckers, motherfuckers come out of everywhere." (*Id.*) Nagi then commented that Kirchoff couldn't identify him and Cicchetti because it was dark outside and Kirchoff was sitting in the police car. (*Id.*)

In another call on December 23, 2005, Nagi told Dennis Vanhulle, "Shit man, we had

a fucking thing last night at Wheat and Rye." (Gov't Ex. 44.) Nagi also told him that the police screwed up because they didn't find one gun that was in the back of his pick-up. "But they fucked up man. The piece, uh, one of the pieces got thrown out, the other piece was in the back of the pick up, inside the snow. They didn't ever find it, dumb motherfuckers." (*Id.*) Nagi said the police were looking for Jeff Pitman and he wasn't even there.

A rational jury could infer from these calls and other evidence that Nagi and Cicchetti were inside the Wheat and Rye during the Kirchoff assault, were not simple bystanders, were active participants who knew Erick Manners had a gun. Nagi responded to Jarrell's initial call by agreeing to bring at least six individuals to the Trolley Stop. When Kirchoff left the Trolley Stop and arrived at the Wheat and Rye, he was soon confronted by at least ten people, including Erick Manners, who began immediately hitting him when Manners pulled out his gun and shot it. Nagi and Cicchetti were seen leaving the Wheat and Rye, driving away at a high rate of speed. When Nagi talks about the fight, he describes it as a participant. Lou Fitzner testified that Nagi told him that Nagi and Cicchetti were inside the bar during the Kirchoff assault and when Erick Manners fired off his pistol. Moreover, there was ample testimony at trial from HMC witnesses that members always back each other up, appear in large numbers so as to intimidate, and it would not be acceptable for a member to wait outside if there was going to be a confrontation inside involving a HMC member. The record is also replete with evidence that it is commonplace for HMC members to possess firearms. There are wire-taps of conversations between Nagi and others concerning weapons he keeps in his home. (Gov't Ex. 27, 10/19/05 conversation between Nagi and J. Jarrell; Gov't Ex. 40, December 15, 2005 conversation between Nagi

and his son concerning weapons.)  Given Mr. Nagi's admission in his conversation with Vanhulle that there was a gun in the back of his pick-up that the police missed (Gov't Ex. 44) and a gun was tossed into a snow bank, a reasonable jury could infer that Manners was not the only person that was armed at the Wheat and Rye during the Kirchoff assault.

The conclusion that there is sufficient evidence on Count 31 as to Defendants Nagi and Cicchetti finds support in the Sixth Circuit's decision in *Rattigan v. United States*, 151 F.3d 551, 557-58 (6th Cir. 1998).  In *Rattigan*, the defendant argued that he could not "be convicted of 'using' a firearm in violation of § 924(c)(1) because no evidence was introduced to indicate that he actually possessed the gun." *Id.* at 557.  The court rejected the argument, observing that, under 18 U.S.C. § 2, "[a]ccomplice liability . . . holds one criminally responsible for acts that he or she assists or influences another in performance." *Id.* It further explained that "[a]iding and abetting has been described as one's desire to in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed." *Id.* at 557-58 (internal quotation marks and citations omitted).  It cautioned that "[t]he government must show that the defendant was a participant rather than merely a knowing spectator, that his presence at the scene of the crime was not surplusage, and that the crime would not have transpired without him." *Id.* at 558.  It then announced the standard that the Court applies here.  "This can be satisfied if the accomplice knows that the principal is armed and acts with the intent to assist or influence the commission of the underlying predicate act." *Id.*

In *Rattigan*, the court affirmed a decision that the defendant had aided and abetted another's use of a gun in relation to a drug trafficking crime, agreeing that "it may be reasonably inferred from the repetitive nature of the drug sales that Rattigan knew of [the

other person]'s gun and benefitted from its presence for protection. . . ." *Id.* Similarly here, applying the Rule 29 standard and Sixth Circuit precedent, this Court concludes that a reasonable jury could infer from the evidence described above and at trial that Defendants Nagi and Cicchetti knew Manners had a gun and acted with the intent to assist or influence the assault on Kirchoff with fists and beer bottles while Manners pointed the gun at Kirchoff and then fired it into the ceiling. The decisions Defendants' rely on do not support a contrary conclusion.

The Court now addresses Defendant Cicchetti's individual Rule 29 arguments.

### (ii) Defendant Cicchetti's Count 2 - RICO Conspiracy Argument

Defendant Cicchetti argues that there is insufficient evidence to support his conviction under Count 2 of the Indictment, the RICO conspiracy, because there is no evidence showing that Cicchetti had a leadership role in the HMC enterprise or was involved in the affairs of the enterprise. The Court disagrees.

First, proof of a leadership role is not an element of a RICO conspiracy charge. As the Supreme Court recently held, an association-in-fact RICO enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, ___ U.S. ___, 129 S. Ct. 2237, 2244 (2009). An association-in-fact enterprise is defined as "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* (internal quotations and citation omitted). Even if leadership were a required element, there is sufficient evidence that Cicchetti held a leadership position in the HMC enterprise by virtue of his membership in the "committee" and because he was the Detroit Chapter President in 2009 and for a period

47

in 2002 when Anthony Clark became National President. (Trial Tr. Vol. 16, Fitzner at 16-17; Vol. 18, D. Sanchez at 27-29.)

Second, what is required to prove a RICO conspiracy is evidence that the defendant "agreed that *someone* would commit two predicate acts." *Driver*, 535 F.3d at 432. There was ample evidence introduced at trial that would allow a reasonable jury to find that Defendant Cicchetti agreed that someone would commit two of the predicate acts alleged in Count 2. Nat Sanchez and Lou Fitzner provide testimony from which a reasonable jury could infer Cicchetti's agreement that someone would commit the predicate act involving the Liberty Riders robbery alleged in Racketeering Act 7. (Trial Tr. Vol. 17, N. Sanchez at 22-27; Vol. 16, L. Fitzner at 19-22.) There is also ample testimony and wire-tap evidence from which a reasonable jury could infer Cicchetti's agreement that someone would commit the predicate acts involving the Burton drug conspiracy alleged in Racketeering Act 9. Bobby Burton testified that he distributed cocaine to Cicchetti, that Cicchetti purchased cocaine from him, and that he saw Cicchetti with and using cocaine. (Trial Tr. Vol. 7, Burton at 87-88.) Mr. Peters also testified that Cicchetti got a lot of drugs off him and that he would sell enough to pay for them. (Trial Tr. Vol. 13, Peters at 134.) Likewise, Daniel Sanchez testified that he saw Cicchetti distribute cocaine by laying it out and sharing it with others, that Cicchetti used and shared cocaine all the time, and that he would buy it from whomever had it. (Trial Tr. Vol. 19, D. Sanchez at 47-48; Vol. 18, D. Sanchez at 43-44.) Chris Miller testified that Cicchetti distributed cocaine at Jacobs bar often enough that "everybody knew that if you want something real quick, just go there and get it from him." (Trial Tr. Vol. 12, Miller at 23-24.) As to Racketeering Act 11, Lou Fitzner testified that Nagi used members like Cicchetti to sell drugs. (Trial Tr. Vol. 16, L. Fitzner at 28.)

### (iii)     There is Sufficient Evidence Re: Cicchetti and Count 19

Finally, Defendant Cicchetti argues that the wire-tapped calls between Nagi and him (Gov't Exs. 41, 54, 56) and the above-described testimony about Cicchetti's purchases, sharing, sales, and distribution of cocaine is insufficient for a reasonable jury to convict him on the drug conspiracy alleged in Count 19.  The jury convicted Cicchetti on this Count and specifically found that he conspired to distribute, or to possess with intent to distribute less than 1 kilogram of cocaine.  Contrary to Cicchetti's arguments here, the evidence described above is sufficient; a rational jury could convict Cicchetti of the charges alleged in Count 19.

### III.  Conclusion

For the above stated reasons, Defendants' Rule 29 and Rule 33 motions are DENIED.


       s/Nancy G. Edmunds                     
       Nancy G. Edmunds
       United States District Judge

Dated:  September 14, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 14, 2010, by electronic and/or ordinary mail.

       s/Carol A. Hemeyer                      
       Case Manager