# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  | 100 EAST FIFTH STREET, ROOM 540 |  |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: September 30, 2013

Mr. Dennis Belli
Law Office
2 Miranova Place
Suite 710
Columbus, OH 43215-7052

Re: Case No. 11-1170/11-1208/11-1221/11-1223/11-1349/11-1354, *USA v. Aref Nagi*
Originating Case No. : 2:06-CR-20465-1

Dear Sir or Madam,

The Court issued the enclosed (Order/Opinion) today in this case.

Sincerely yours,

s/Bryant L. Crutcher
Case Manager
Direct Dial No. 513-564-7013

cc: Mr. John W. Brusstar
Ms. Patricia Gaedeke
Mr. Timothy J. McKenna
Aref Nagi
Mr. Sanford Plotkin
Mr. Kevin Michael Schad
Ms. Margaret Marie Smith
Mr. James C. Thomas
Mr. David J. Weaver
Joseph Whiting

Enclosure

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 13a0854n.06

**Nos. 11-1170, 11-1208 11-1221, 11-1223, 11-1349, 11-1354**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Sep 30, 2013 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| AREF NAGI, MICHAEL CICCHETTI, GARY | ) | MICHIGAN |
| BALL, JR., LEONARD MOORE, JOSEPH | ) | |
| WHITING, and ANTHONY CLARK, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: SILER, GIBBONS, and GRIFFIN, Circuit Judges.

**SILER**, Circuit Judge. Aref "Steve" Nagi, Michael "Cocoa" Cicchetti, Gary "Junior" Ball, Leonard "Dad" Moore, Joseph "Little Joe" Whiting, and Anthony "Mad Anthony" Clark–members of the Highwaymen Motorcycle Club–were charged and convicted of numerous crimes, including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(c); RICO conspiracy, 18 U.S.C. § 1962(d); Violent Crimes in Aid of Racketeering ("VICAR"), 18 U.S.C. § 1959(a)(3); drug conspiracy, 21 U.S.C. § 846; conspiracy to transport stolen motor vehicles, 18 U.S.C. §§ 2312 and 371; conspiracy to alter or remove vehicle identification numbers, 18 U.S.C. §§ 511 and 371; and the illegal use of firearms, 18 U.S.C. § 924(c). They appeal their convictions and sentences on various grounds. For the following reasons, we **AFFIRM IN PART, REVERSE IN PART,** and **REMAND** for further proceedings.

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

## I.

The Highwaymen Motorcycle Club ("HMC") is a multi-state organization with its national headquarters located in Detroit, Michigan.  In its prime, HMC included approximately ten chapters, mostly in and around Detroit.  Each chapter, with its own officers and internal leadership structure, operated within the hierarchy of the organization as a whole.  Members earned their HMC "colors" after going through a probationary period and could earn lightning rods–a symbol worn on the HMC vest–by committing various types of criminal activity in the interest of the Club.

Illegal drugs were common within the HMC.  Trial testimony suggested that many members did not hold regular jobs and met their obligation to pay weekly dues by selling drugs.  Nagi, for instance, sold cocaine and marijuana.  Cicchetti purchased cocaine from HMC member Gerald Peters both for distribution and personal use.  On multiple occasions, Cicchetti brought his work crew to the HMC clubhouse so that they could obtain cocaine there.   Robert Burton, a major cocaine dealer, testified that Defendant Ball was as big a cocaine distributor as himself.  Clark worked with HMC member Daniel Sanchez to sell drugs.  And Moore and Whiting, as senior members of the HMC, often received free cocaine from other HMC members.

HMC members also were involved in the theft and resale of motorcycles.  During "bike week" in Myrtle Beach, South Carolina, HMC members including Nagi and Ball stole motorcycles and transported them back to Detroit via U-Haul.  Later, some of the stolen bikes were found in the possession of HMC members.  While executing a search warrant at Ball's family business, "Pal's Auto," agents found numerous stolen motorcycles and cars with altered vehicle identification

- 2 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

numbers. Trial testimony revealed that Cicchetti, Ball, and Whiting all possessed vehicles with altered VINs.

The HMC also has a history of violent acts. Many of the group's violent acts were done to further the Club's criminal enterprise and to protect the authority and reputation of the HMC amongst rival gangs. For example, in 2003, HMC member Burton attempted to buy cocaine from Ruben Guzman. When Guzman's cocaine broker refused to proceed with the deal, Guzman kept the money that Burton had already given him. In retaliation, Burton and fellow HMC members pistol-whipped and robbed Guzman before locking him inside the trunk of a car and driving away. Guzman, was able to escape by activating the trunk's emergency release.

Highly relevant to this case is a 2005 incident at a Detroit-area bar called the Wheat & Rye. Following an altercation at another bar, several HMC members assaulted Alan Kirchoff at the Wheat & Rye by punching him and breaking glass bottles over his head. HMC member Erick Manners brandished a gun, pointed it at Kirchoff, and proceeded to fire two rounds into the ceiling. Police officers who responded to the scene pursued a black pick-up truck that was speeding away from the bar. The truck came to a stop on a dead-end street and officers observed an individual running away from the driver's side of the truck. When the officers approached the truck, they observed Defendants Cicchetti and Nagi still inside, along with a Highwaymen vest in the cab. A Glock pistol with hollow point bullets was located on the ground nearby, although law enforcement officials determined that it was not the gun that was fired inside the Wheat & Rye. Wiretapped telephone conversations between Nagi and Bo Moore, "Dad" Moore's son and fellow HMC member, confirmed Nagi's and Cicchetti's involvement in the incident.

- 3 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

In 2006, some HMC members suspected that Gerald Deese had stolen their property. Burton encouraged HMC members to confront Deese. They did so, striking him with a shovel handle until he lost consciousness. Later, in an effort to dissuade Deese from pressing charges, Whiting and Dad Moore arranged for Deese to receive several thousand dollars in cash.

Later in 2006, a rival gang called the Latin Counts learned that the FBI was investigating both the Counts and the HMC. Believing that HMC member Doug Burnett was the informant, Whiting, who was the HMC national president at the time, sanctioned the elimination of Burnett by either the Counts or HMC members. Burnett's picture was displayed in the HMC clubhouse along with the caption "rat." Whiting, along with Detroit Chapter president Ronald Hatmaker, offered a bounty on Burnett's life, as well as a reward of time away from HMC business.

## II.

**The district court properly denied Nagi's motion to suppress wiretapped conversations, as well as his request for an evidentiary hearing under *Franks v. Delaware,* 438 U.S. 154 (1978).**

During its investigation, the government obtained multiple Title III wiretap orders, authorizing the interception of thousands of telephone calls among HMC members. One such order, and extensions thereof, authorized the interception of Nagi's telephone number from October 2005 through May 2006. Prior to trial, Nagi unsuccessfully moved on various grounds to suppress the intercepted calls. While we review the district court's factual findings for clear error and its legal conclusions de novo, *United States v. Stewart,* 306 F.3d 295, 304 (6th Cir. 2002), the issuing judge's determination with respect to an electronic surveillance order is entitled to significant deference. *United States v. Corrado,* 227 F.3d 528, 539 (6th Cir. 2000).

- 4 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

Nagi argues that the wiretaps did not meet the necessity requirement of 18 U.S.C. § 2518(1)(c).[1] Specifically, he argues that the affidavits used to obtain judicial authorization did not establish that less intrusive investigatory techniques were insufficient to meet law enforcement needs. However, law enforcement officials are required only to "give serious consideration to the non-wiretap techniques prior to applying for wiretap authority" and inform the court of the reasons for their belief that non-wiretap techniques "have been or will likely be inadequate." *Stewart,* 306 F.3d at 305 (quoting *United States v. Lambert,* 771 F.2d 83, 91 (6th Cir. 1985)). The initial electronic surveillance affidavit detailed the reasons officials believed that a wiretap was necessary. It stated that while three confidential informants had been used, they had not shed light on all of the participants in the conspiracy. It also explained that at least one informant was reluctant to wear a wire due to safety concerns. Further, traditional surveillance techniques were hampered by counter-surveillance techniques employed by the HMC.

Nagi also argues that the government failed to minimize the intercepted calls to avoid unnecessary intrusion on private, non-criminal conversations, as required by 18 U.S.C. § 2518(5). However, defendants seeking to suppress wiretapped phone conversations must do more than identify particular calls that should not have been intercepted–"they must establish a pattern of interception of innocent conversations which developed over the period of the wiretap." *United States v. Lawson,* 780 F.2d 535, 540 (6th Cir. 1985). The burden of persuasion with respect to

---

[1] Wiretaps applications are required to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

- 5 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

minimization rests with Nagi. *See United States v. Giacalone,* 853 F.2d 470, 482 (6th Cir. 1988).

He has failed to make the requisite showing.

> The wiretap orders at issue state:
>
> All of the interceptions will be minimized in accordance with Chapter 119, Title 18, United States Code. Interceptions will be minimized when it is determined through voice identification, physical surveillance or otherwise that none of the named interceptees or their confederates, when identified, are participants in the conversation, unless it is determined the conversation is criminal in nature.

At a February 2010 hearing, the government described in detail the minimization procedures it employed. Nagi fails to identify any particular conversations that should not have been monitored, stating only that "[i]t does not appear as if minimization consistent with the statute and case law took place." He relies on statistical data alone, claiming that when viewed in light of the low number of calls involving crime, an unreasonable percentage of calls was minimized. He goes on to state that some of the intercepted conversations were "personal" and did not relate to targets of the investigation. These conclusory arguments simply are insufficient to mandate reversal of the district court's denial of his motion to suppress the phone calls.

Finally, Nagi argues that the intercepted calls should have been suppressed because the government did not provide sealing orders during discovery. As Nagi points out, "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." 18 U.S.C. § 2518(8)(a). Nagi implies that the government delayed in making the recordings at issue available to the judges who issued the wiretap orders. His express complaint, however, is that the government should have provided him with the sealing orders issued by the judges after the recordings were made available

- 6 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

to them. In response to Nagi's motion to suppress, the government explained that "housekeeping items" such as sealing orders ordinarily are not provided in discovery. Nonetheless, the government provided the orders to Nagi upon his request. Nagi has failed to identify any prejudice resulting from the government's alleged delay in providing the sealing orders to him. Accordingly, his argument with respect to the sealing orders is without merit.

Nagi also fails to demonstrate that the district court erred in denying him a hearing under *Franks v. Delaware,* 438 U.S. 154 (1978). To mandate an evidentiary hearing under *Franks,* "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth." *Id.* at 171. Further, the allegedly false statement must have been necessary to the finding of probable cause for the wiretap order. *Id.* at 155-56. Other than the arguments outlined above, Nagi identifies no deficiencies with respect to the wiretap orders or the affidavits used to obtain them. Accordingly, Nagi's attack does not warrant reversal of the district court's decision to deny a hearing.

### III.

**Moore's motion for severance was properly denied.**

We review a district court's denial of a motion to sever for an abuse of discretion. *United States v. Cody,* 498 F.3d 582, 586 (6th Cir. 2007). Since Moore did not renew his motion to sever at the close of evidence, however, we can reverse only upon a showing of plain error. *See United States v. Lopez,* 309 F.3d 966, 971 (6th Cir. 2002). Generally, persons jointly indicted should be tried together because "there is almost always common evidence against the joined defendants that allows for the economy of a single trial." *Id.* (internal citation omitted). Severance should be granted only "if there is serious risk that a joint trial would compromise a specific trial right of one

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."

*Id.* (internal citation omitted). That a defendant might stand a better chance of acquittal if his trial were severed does not require the court to grant his motion. *Id.* Moore asserts that he suffered compelling, specific, and actual prejudice from being tried along with his co-defendants because he was convicted based on his "mere association with the HMC." This is precisely the type of generalized argument that cannot sustain a motion to sever, particularly when viewed through the deferential lens of plain-error review.

## IV.

**The government's evidence at trial did not create a variance from or a constructive amendment to the indictment.**

"A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Caver,* 470 F.3d 220, 235 (6th Cir. 2006). "A variance is not reversible error unless the defendant demonstrates prejudice." *United States v. Nance,* 481 F.3d 882, 886 (6th Cir. 2007). If a variance is serious enough, it becomes a constructive amendment. *United States v. Budd,* 496 F.3d 517, 521 (6th Cir. 2007). This occurs "only when the variance creates a substantial likelihood that a defendant may have been convicted of an offense other than that charged by the grand jury." *Nance,* 481 F.3d at 886. Reviewing the district court's ruling *de novo, see Nance,* 481 F.3d at 886, we conclude that the government's proof did not create a variance or constructive amendment.

- 8 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

Both Nagi and Moore argue that the government varied from Count 2 of the Superseding Indictment–conspiracy to violate RICO.  Nagi argues that the government deviated from the indictment because "the HMC was a defendant in this case, as alluded to by the government in declaring it a criminal organization directly benefitting from the actions of its members."  He contends that, at trial, the government "stated that the HMC was not a criminal organization, and it was not illegal to join the HMC, an organization it originally charged as a criminal enterprise."  Essentially, Nagi argues that rather than proving one large racketeering conspiracy, the government introduced evidence of several different drug conspiracies involving HMC members.  Contrary to Nagi's assertion, however, the HMC was never named as a defendant in this case.  Further, the evidence used to prove the existence of a RICO conspiracy necessarily overlaps with evidence of the specific criminal acts of members of the conspiracy.  While the existence of a RICO conspiracy was a question for the jury to decide, the question of the conspiracy's existence certainly did not create a variance from or a constructive amendment to the indictment.  Under Nagi's theory, the government's failure to carry its burden of proof with respect to RICO would automatically constitute a variance from the indictment.  This is an untenable proposition and is without support in the law.

Likewise without merit is Whiting's argument that the government varied from Count 13 of the Superseding Indictment–conspiracy to commit murder.  Whiting acknowledges that, per the indictment, he was charged with conspiring with Cicchetti, Moore, and Ball to kill Burnett.  He argues that, during trial, the government presented evidence that he conspired separately with Anthony Viramontez, leader of the rival gang, Latin Counts, to murder Burnett.  Whiting takes issue

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

with the fact that Viramontez was not listed as a co-conspirator in Count 13 of the indictment and

that Count 13 did not contain the language "and others known and unknown." In *United States v.*

*Pingleton,* 216 F. App'x 526 (6th Cir. 2007), two individuals were charged with agreeing to commit

a drug offense, but the proof at trial implicated a third individual who was not named in the

indictment. As is the case here, the indictment failed to include the customary "and others known

and unknown" language. *Id.* at 529. We concluded that, although the lack of customary language

was atypical, no variance or constructive amendment had occurred because the complaining

defendant had otherwise received notice regarding the uncharged conspirator. *Id.* We also noted

the general rule that the prosecution is not required to furnish co-conspirators' names so long as the

defendant has notice of the conspiracy with which he is charged. *Id.* (citing *United States v. Rey,* 923

F.2d 1217, 1222 (6th Cir. 1991)). As in *Pingleton,* there is no doubt that Whiting received notice

of the conspiracy with which he was charged and that Viramontez was thought to be part of the

conspiracy. At the very least, Viramontez's involvement was discussed during a May 2009 detention

hearing and his name was mentioned in at least 30 discovery documents that Whiting received well

before trial. Accordingly, Whiting's argument is without merit.

## V.

### The jury instructions did not shift the burden of proof to Defendants.

Defendants Ball, Moore, Whiting, and Clark argue that, when instructing the jury, the district

court impermissibly shifted the burden of proof to the defendants. The instruction portion of the

original trial transcript revealed the following statement: "In order to convict a defendant on the

RICO conspiracy offense charged in Count 2, the defendant must prove all of the following five

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

elements beyond a reasonable doubt . . . ." The court reporter reviewed the audio recording of the trial, however, and acknowledged that the word "defendant" was a typographical error–the instruction actually given had placed the burden of proof on the government. Based on the error, the court reporter filed a corrected transcript.

None of the defendants addresses the government's argument or acknowledge the existence of the corrected transcript. Although Ball and Moore filed reply briefs, neither addressed this issue. Considering these circumstances, it seems that the defendants do not seriously dispute that the district court applied the correct burden of proof. Accordingly, the defendants' argument with respect to the jury instruction fails.

## VI.

### The defendants have not established prosecutorial misconduct.

Defendants argue that their trial was substantially affected by prosecutorial misconduct and that, as a result, their convictions should be overturned. Much of the defendants' quarrel with the government's conduct centers around the payment of money to witnesses.

As part of its case-in-chief, the government called several cooperating witnesses to testify. Some of those witnesses had previously received money from the government–mainly to compensate them for relocation expenses. At a pretrial hearing in March 2010, the government gave to defense counsel a letter that described the payments made to six of the cooperating witnesses. On April 19, 2010–during trial, but well before Philip McDonald's May 11 testimony–the government delivered another letter to defense counsel detailing a payment in excess of $44,000 to McDonald for relocation expenses. The defendants contend that the government's "delayed" production of the

- 11 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

information concerning the payment to McDonald constitutes a violation of the rule established in *Brady v. Maryland,* 373 U.S. 83 (1963). However, "*Brady* is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial." *United States v. Mullins,* 22 F.3d 1365, 1371 (6th Cir. 1994). Because the information was provided in a manner that gave the defendants ample time to cross-examine witnesses regarding the payments, the *Brady* concern is not present here. Defendants also argue that the government committed misconduct by promising another witness, Burnett, a bonus at the conclusion of the case. There is no indication in the record, however, that Burnett was promised a bonus that was contingent upon conviction or the nature of the testimony given. Accordingly, the defendants' opportunity to cross-examine Burnett was a sufficient safeguard against impropriety. *See United States v. Grimes,* 438 F.2d 391, 395-96 (6th Cir. 1971); *see also United States v. Levenite,* 277 F.3d 454, 462-463 (4th Cir. 2002) (describing additional safeguards that are necessary when payment is contingent upon conviction or testimony of a specific nature).

Additionally, Ball argues that the prosecution committed misconduct by proceeding to trial against him on Count 13–conspiracy to commit the murder of Burnett–and then dropping the charge prior to jury deliberations. There is no indication, however, that the government had an improper motive for proceeding in the way that it did. Law enforcement's investigation revealed Ball to be among those implicated in the plan to kill Burnett. Prior to trial, essential witnesses became unavailable, leading the government to conclude that it would be unable to prove the charge against Ball. Further, the jury did not receive a copy of the indictment until the conclusion of the case, so

- 12 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

it never knew that Ball faced the charge and, thus, could not have been prejudiced against Ball on
that basis.

## VII.

### Clark's indictment was not barred by the statute of limitations.

We review the district court's denial of Clark's motion to dismiss *de novo. See United States
v. Cunningham,* 679 F.3d 355, 373 (6th Cir. 2012). The five-year statute of limitations begins
running "only when the purposes of the conspiracy have either been accomplished or abandoned."
*United States v. Tocco,* 200 F.3d 401, 425 n. 9 (6th Cir. 2000) (quoting *United States v. Salerno,* 868
F.2d 524, 534 (2d Cir. 1989)). Further, A RICO conspiracy charge is not time barred, even where
the individual defendant has not committed a predicate act within the five-year limitations period,
where there is no suggestion that the defendant withdrew from the conspiracy at any time. *United
States v. Saadey,* 393 F.3d 669, 677-78 (6th Cir. 2005). Clark has offered no evidence that he
abandoned his involvement in the HMC's criminal activities. Although he was no longer national
president at the time, notes from a 2005 HMC meeting reveal that Clark was present, reviewing a
list of honorary members of the club. Additionally, Clark offers no argument that the second
superseding indictment fails to relate back to the original. *See United States v. Garcia,* 268 F.3d
407, 414-16 (6th Cir. 2001) (superseding indictments might not relate back for statute-of-limitations
purposes when the charges therein are materially broadened from those in the previous indictment).
Even if the second superseding indictment did not relate back to the first, however, Clark's argument
still fails. The second superseding indictment was filed on December 15, 2009. Clark's documented

- 13 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

HMC activity within five years of that date renders the charges against him within the statute of limitations.

## VIII.

### Sufficient evidence exists to support each Defendant's conviction.

Each defendant challenges his conviction based on the sufficiency of the evidence against him. In considering such challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

## A.    Nagi

Nagi was convicted of multiple counts, including violations of RICO, conspiracy to violate RICO, assault with a dangerous weapon in aid of racketeering, conspiracy to transport stolen property, conspiracy to alter vehicle identification numbers, conspiracy to possess with intent to distribute cocaine, and use of a firearm in relation to a crime of violence. He claims that the government did not provide sufficient evidence to establish the enterprise element of RICO. The RICO statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Further,

> the enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct . . . . [This element] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.

- 14 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

*United States v. Turkette,* 452 U.S. 576, 583 (1981). And while there must be some structure to distinguish an enterprise from a mere conspiracy, there does not have to be much. *United States v. Johnson,* 440 F.3d 832, 840 (6th Cir. 2006) (citing *United States v. Rogers,* 89 F.3d 1326, 1337 (7th Cir. 1996)). The government does not need to prove that the particular defendant at issue committed or agreed that he, himself, would commit two predicate acts, or even that any overt acts have been committed. *Saadey,* 393 F.3d 669, 676 (6th Cir. 2005).

Specifically, Nagi relies on *United States v. Gibbs,* 182 F.3d 408 (6th Cir. 1999), to support the proposition that the defendants were disparate drug dealers and, therefore, did not form an enterprise. *Gibbs* is distinguished easily, however. *Gibbs* involved a group called the "Short North Posse" and their alleged conspiracy to monopolize the crack cocaine trade in a certain section of Columbus, Ohio. There, we found that the government had failed to present any specific evidence that the defendants agreed to participate in a conspiracy. *Gibbs,* 182 F.3d at 423. While some HMC members testified that they and others in the organization sold drugs "for themselves," there was ample evidence from which a jury could have concluded that the defendants actually committed the criminal acts in their capacities as members of the HMC. Also, unlike the Short North Posse, the HMC had a clearly defined hierarchy and held regular meetings, supporting the notion that they were, indeed, an enterprise for purposes of RICO.

There was also sufficient evidence to satisfy the "continuity plus" requirement. *See United States v. Fowler,* 535 F.3d 408, 419 (6th Cir. 2008). This test requires a relationship between the predicate acts and a threat of continued activity. *Id.* at 419-20. "Predicate acts do not necessarily need to be directly interrelated," but "they must . . . be connected to the affairs and operations of the

- 15 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

criminal enterprise." *Corrado*, 227 F.3d at 554. The jury was well within reason to conclude that the HMC's acts of violence were based on the group's rivalries and loyalties, as well as protecting the reputation of the group itself. The theft of vehicles and alteration of VINs came about as the result of HMC "runs," and drug dealing was widespread throughout the club and took place in the clubhouse. Additionally, there is no question that the racketeering acts presented a threat of continued activity. Ample evidence suggests that the predicates can be attributed to the defendants, operating as part of a long-term association which existed for criminal purposes. *See H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 243 (1989) (continuity requirement is satisfied where predicate acts are a part of an ongoing entity's "regular way of doing business"). The evidence belies the defendants' suggestion that the  group's racketeering acts were sporadic, unrelated activities.

Nagi also argues that there was insufficient evidence to support his conviction for Racketeering Act 8, Count 15 (conspiracy to transport stolen property in interstate commerce) and Count 16 (conspiracy to alter, remove, and obliterate vehicle identification numbers). In addition to the testimony of fellow HMC member Lou Fitzner, Burnett testified that HMC members, including Nagi, stole motorcycles in Myrtle Beach and transported them back to Michigan. Fitzner testified that Nagi worked with others to alter the serial number on a stolen motorcycle that Nagi stored in his garage. Based on the testimony of Fitzner and Burnett, rational jurors could have concluded that Nagi was guilty of the charges.

Finally, Nagi contends that there was insufficient evidence to convict him of aiding and abetting under 18 U.S.C. § 924(c)–use of a firearm during and in relation to a crime of violence in relation to the incident at the Wheat & Rye. To sustain a conviction under section 924(c), the

- 16 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

government must prove "that the defendant, as the accomplice, associated and participated in the use of the firearm in connection with the underlying . . . crime." *United States v. Franklin,* 415 F.3d 537, 554-55 (6th Cir. 2005). As the district court concluded, there was sufficient evidence from which a reasonable jury could have inferred that Nagi was inside the Wheat & Rye during the assault, that he knew Manners possessed a gun, and that he acted with the intent to assist or influence the commission of the underlying crime of assault with a dangerous weapon. Fitzner testified that Nagi told him that he was inside the Wheat & Rye during the assault. Officers responding to the scene observed Nagi and others speeding away from the bar and later observed a pistol on the ground near the parked vehicle. Nagi's own statements to Bo Moore and Dennis Vanhulle, obtained through intercepted phone calls, further confirmed his involvement in the incident. This evidence is sufficient to support the verdict against Nagi.

**B.  Cicchetti**

Cicchetti argues that there was insufficient evidence to convict him on Counts 7 (assault with a dangerous weapon in aid of racketeering) and 31 (use of a firearm during and in relation to a crime of violence)–both based on the assault on Kirchoff at the Wheat & Rye Bar. As Cicchetti notes, a defendant cannot aid or abet a section 924(c) violation without knowing that a gun will be used or carried in relation to the underlying crime. *See Wright v. United States,* 182 F.3d 458, 465 (6th Cir. 1999). A reasonable juror could have determined that the government made this showing with respect to Cicchetti. Fitzner testified that Nagi told him that both he and Cicchetti were inside the Wheat & Rye when the shots were fired. Police officers identified Cicchetti, along with Nagi, inside a truck that was fleeing the scene. The intercepted phone calls between Nagi and his HMC

- 17 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

confidants confirmed that Cicchetti was an active participant in the Wheat & Rye incident.  Further,

given the HMC's penchant for violence, under these circumstances, it was fair for the jury to infer

that Cicchetti was aware of and encouraged this particular use of a firearm.  In his statement to the

police, Kirchoff stated that "a group of about ten people busted in" and he immediately started being

hit from all sides.  Following the attack, Kirchoff visited Bo Moore and told him, "Your boys shot

at me; they jumped me and hit me with beer bottles and stuff."  It was within reason for the jury to

infer, based on the evidence presented, that Cicchetti was one of those who "busted in" and began

hitting Kirchoff with bottles.  Accordingly, Cicchetti's conviction on Count 7 also is supported by

sufficient evidence.

　　　　Cicchetti also argues that there was insufficient evidence to support his convictions based

on Counts 2 (RICO conspiracy) and 19 (conspiracy to possess with intent to distribute less than one

kilogram of cocaine).  As to the RICO conspiracy, he contends that there was no evidence that he

had a leadership role in the HMC enterprise or that he was involved in the affairs of the enterprise.

The record contains ample evidence, however, from which a jury could have found the elements of

the crime satisfied.  First, "RICO liability is not limited to those with primary responsibility for the

enterprise's affairs."  *Ouwinga v. Benistar 419 Plan Servs., Inc.,* 694 F.3d 783, 791-92 (6th Cir.

2012).  Rather, the defendant need only have participated in the management or operation of the

enterprise.  *Id.* at 792.  Cicchetti's management role can be inferred based on his membership in the

"committee," as well as his two tenures as Detroit Chapter President.  There was ample evidence that

he was involved in the affairs of the enterprise, including that of his involvement in the assault on

Kirchoff, as well as his using and selling drugs with other HMC members.  There was also sufficient

- 18 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

evidence from which the jury could have concluded that Cicchetti agreed that someone would commit at least two of the predicate racketeering acts alleged in the indictment. Testimony from Burnett and Burton regarding Cicchetti's drug use and sales in connection to the HMC supports the conclusion that he conspired to distribute controlled substances, as alleged in Racketeering Act 11. Further, Burton testified that he distributed cocaine to Cicchetti and that he saw Cicchetti in possession of and using cocaine. Based on this testimony, the jury reasonably could have inferred that Cicchetti agreed that Burton, among others, would distribute cocaine, as alleged in Racketeering Act 9. Peters testified that Cicchetti bought a lot of drugs from him and that he would sell enough to pay for them. Additionally, wiretapped phone conversations between Cicchetti and Nagi were presented, in which the two discussed cocaine. This evidence would have allowed the jury to conclude that Cicchetti agreed to the conspiracy to distribute controlled substances alleged in Racketeering Act 11. Based on the testimony of Nat Sanchez and Lou Fitzner, the jury also reasonably could have concluded that Cicchetti agreed that HMC members would beat and rob members of the Liberty Riders Motorcycle Club, as alleged in Racketeering Act 7. For the reasons already discussed, there is sufficient evidence to support the jury's finding that Cicchetti is guilty of Count 19, involving less than one kilogram of cocaine.

**C.     Ball**

Ball argues that because he was merely involved in a "handful of ordinary buy/sell drug transactions," there was insufficient evidence to support his drug conspiracy convictions under Counts 19 and 20. Several witnesses testified as to Ball's extensive drug dealing activities. Burnett executed at least three controlled buys of cocaine from Ball. Each buy was for about four and a half

- 19 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

ounces of cocaine, which cost around $3,400.  Burton, a former HMC member, testified that Ball was his competitor when it came to selling cocaine and that the two men had a physical altercation when Ball accused Burton of stealing one of his customers.  In April 2006, after executing a search warrant at Ball's home, agents seized 175.3 grams of cocaine.  Ball's challenge to his conspiracy conviction (Count 2) fails for the reasons already given.

Ball also argues that the government did not establish that he participated in the "operation or management" of the criminal enterprise for purposes of Count 1.  *See Reves v. Ernst & Young,* 507 U.S. 170, 179 (1993).  However, Ball was an important member of the HMC.  He was an "honorary," having achieved senior status, and also was the president of the Detroit East Side Chapter and opened his own chapter at Eight Mile.  His principal role in stealing motorcycles in Myrtle Beach also demonstrates his key position in the organization's illegal acts.

Additionally, Ball contends that the trial court erred by failing to grant his motion for a mistrial following a spectator's outburst during the testimony of cooperating witness Daniel Sanchez.  During Sanchez's testimony, a woman in the gallery stood up and allegedly pointed in the direction of Ball and the other defendants, shouting, "they murdered my son."  After the jury was excused, the spectator informed the court that her outburst was  motivated by her belief that Sanchez had been given immunity for the murder of her son, based on his testimony against the defendants.  The trial judge is in the best position to evaluate the prejudicial effect of a spectator's outburst.  *See, e.g., Staton v. Parke,* 12 F.3d 214 (6th Cir. 1993) (table); *United States v. Brooks,* 670 F.2d 148, 152 (11th Cir. 1982).  In this case, the district court immediately instructed the jurors to disregard the statement and noted that the jurors nodded their heads in understanding.  In the case of a spectator

- 20 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

outburst, a hearing to determine jury impact is not necessarily required. *See White v. Smith,* 984 F.2d 163, 166 (6th Cir. 1993). "This is particularly true when, as in this case, the trial judge follows up with a statement to the jury, allaying any apprehensions." *Id.* at 166-67. At this point, significant resources had been expended in trying the case, and the trial judge was within her discretion to determine that the defendants would not be prejudiced by the outburst. Further, we find no merit in Ball's arguments regarding his inability to cross-examine Sanchez about his involvement in a murder that was the subject of an ongoing investigation. After rejecting Ball's motion in limine to cross-examine Sanchez regarding the murder, the district court rejected his second request to cross-examine following the spectator outburst. The district court adhered to its previous rationale that under Federal Rule of Evidence 608(b), evidence of the murder was not probative of truthfulness. Further, it reasoned, in the context of the outburst, cross-examining Sanchez about a murder the jury knew nothing about would be of no benefit to the defendants. The district court did not abuse its discretion in restricting the defendants' ability to cross-examine Sanchez about the murder. *See United States v. Franco,* 484 F.3d 347, 353 (6th Cir. 2007) (providing standard of review).

**D.    Moore**

Moore argues that because he was acquitted of the predicate acts in the substantive RICO count, he cannot be convicted for conspiracy to violate RICO. Like Ball, he also argues that the evidence was insufficient to show that he had a role in the "operation or management of the enterprise." *Reves,* 507 U.S. at 179. However, Moore was known as the "godfather" of the HMC and was likely the most powerful member of the organization. Trial testimony revealed that all significant club decisions had to go through him. As previously stated, it is not necessary that Moore

- 21 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

committed the predicate acts himself. Rather, he is a conspirator because he agreed to facilitate acts

leading to the substantive offense. *See Saadey,* 393 F.3d at 676. Moore routinely accepted gifts of

narcotics for his own personal use from drug dealing HMC members. Based on the totality of the

evidence, it was reasonable for the jury to infer that, while Moore might not have been on the street

committing illegal acts himself, he was aware of and directing HMC members' activities such that

he was guilty of conspiring to violate RICO.

### E.    **Whiting**

Whiting argues that the government failed to present sufficient evidence to convict him on

his four guilty counts–racketeering, conspiracy to commit racketeering, conspiracy to commit murder

in aid of racketeering, and possession of stolen vehicles. First, Whiting argues that there was no

evidence demonstrating that he conspired to kill Burnett and that, rather, he was ambivalent about

the situation. While there is no indication of an express command to "kill" Burnett, Whiting did say

that Burnett "needed to go if anybody found him" and, at HMC meetings, if "anyone finds [Burnett],

get his ass." Considering the contemporaneous talk amongst the HMC and rival gang Latin Counts

concerning the need to eliminate Burnett–the "snitch"–a jury could have reasonably inferred that

Whiting agreed to murder Burnett.

Whiting also argues that there was insufficient evidence to convict him of Count 47 (receipt

and possession of stolen vehicles). Former HMC member McDonald testified, however, that club

members had brought "quite a few" stolen bikes back from South Carolina and that Whiting showed

him one, telling him that it was from Myrtle Beach. That particular bike did not have a motor on it,

and Whiting said that he was going to "bring it out" after replacing the motor–an act the HMC often

- 22 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

did with stolen bikes.   A reasonable jury could have inferred from this testimony, and other testimony about HMC members stealing bikes from Myrtle Beach, that Whiting had received a stolen motorcycle and that he was in the process of altering it when he showed it to McDonald.

## F.    Clark

Like Moore, Clark argues that his acquittal on Count 1 (substantive RICO charge) precludes a finding of guilty on Count 2 (conspiracy to violate RICO).   To be convicted of conspiracy to commit RICO, the defendant must have "agreed to join a racketeering enterprise and [have] agreed to the commission of any two of the various predicate acts charged in the indictment." *Callanan v. United States,* 881 F.2d 229, 235 (6th Cir. 1989).   The defendant, however, does not have to agree that *he* will commit the predicate acts–only that *someone* will commit at least two predicate acts. *See United States v. Russo,* 796 F.2d 1443, 1462 (11th Cir. 1986).   While Clark was acquitted of both of the racketeering acts with which he was charged, there was sufficient evidence to support the jury's conclusion that he agreed that someone would commit at least two of the racketeering acts alleged in Count 1 of the indictment.   For example, while Clark was acquitted of Racketeering Act 9 (conspiracy to distribute cocaine), there is ample evidence from which the jury could have concluded that Clark agreed that other HMC members would distribute cocaine.   The same can be said of Racketeering Act 11 (conspiracy to distribute controlled substances).   While Clark was not charged with this act, the jury easily could have found that Clark agreed for other HMC members to commit it.   The record reveals that Clark conspired with Sanchez and others to purchase cocaine and provide that cocaine to other HMC members–often for sale/distribution to the general public. Additionally, Nagi and Ball shared drugs with the HMC leadership, and Clark held leadership

- 23 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

positions during the time of the conspiracy.  Clark even brought his employees to the HMC

clubhouse so that they could purchase cocaine.  That, combined with the fact that HMC leadership

condoned drug use and sales at the clubhouse is sufficient evidence from which the jury could have

inferred that Clark had conspired with other HMC members to distribute controlled substances.  *See*

*United States v. Driver,* 535 F.3d 424, 429 (6th Cir. 2008) (formal agreement not required–tacit

understanding among the parties is sufficient for conspiracy).

## IX.

**Clark and Moore are entitled to a limited remand for resentencing on Count 2.  All other Defendants' sentences are proper.**

**A.    Nagi**

Under the United States Sentencing Guidelines ("USSG"), Nagi was assigned a range of 324-

405 months and sentenced to 324 months in prison.  He argues that, in relation to his Count 2 RICO

conspiracy conviction, he was incorrectly sentenced based on the conduct of his co-defendants.  In

examining the district court's application of the Guidelines, we review factual findings for clear

error.  *See United States v. Hamilton,* 929 F.2d 1126, 1130 (6th Cir. 1991).  Whether the facts

determined by the district court warrant the application of a particular guidelines provision is a

purely legal question, however, and is reviewed *de novo.  United States v. Partington,* 21 F.3d 714,

717 (6th Cir. 1994).

USSG § 1B1.3(a)(1)(A) and (B) allows the court to take into account during sentencing "all

acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or

willfully caused by the defendant," as well as "all reasonably foreseeable acts and omissions of

- 24 -

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

others" in the case of "jointly undertaken criminal activity." The existence of relevant conduct for

calculating a base offense level is determined by the court at sentencing by a preponderance of the

evidence. *Corrado,* 227 F.3d at 541-42. The district court engaged in a lengthy and detailed analysis

concerning the conduct of other HMC members that was relevant to determining Nagi's base offense

level. The court determined that, because of Nagi's role of authority within the organization, USSG

§ 1B1.3(a)(1)(A) was satisfied. The record indicates that the HMC was very transparent concerning

drug activity, crimes of violence, and theft, so Nagi reasonably should have foreseen the acts of his

cohorts. Accordingly, the district court did not err in sentencing Nagi based on the predicate acts

committed by others.

**B.    Ball**

On a Guidelines range of 360 months to life, Ball received a sentence of 360 months in

prison. He argues that the district court incorrectly calculated his drug quantity and improperly

enhanced his sentence with a leadership role pursuant to USSG § 3B1.1(a). He correctly contends

that because the district court failed to ask the *Bostic* question, the reasonableness of his sentence

is reviewed for abuse of discretion rather than plain error. *See United States v. Ross,* 703 F.3d 856,

884-85 (6th Cir. 2012). The district court's interpretation of the Guidelines is reviewed *de novo* and

its factual findings are reviewed for clear error. *Gall v. United States,* 552 U.S. 38, 46 (2007).

Review of whether a defendant had an "organizer or leadership role," however, is deferential, in light

of our decision in *United States v. Washington,* 715 F.3d 975, 982-84 (6th Cir. 2013).

Ball argues that he should not have been sentenced based on drug amounts attributed to his

co-conspirators. However, a defendant is liable for quantities of drugs distributed by co-conspirators

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

provided such amounts are reasonably foreseeable to the defendant. *United States v. Lloyd,* 10 F.3d 1197, 1219 (6th Cir. 1993).   During Ball's sentencing hearing, the district court discussed extensively the reasons it assigned him the drug quantity it did.  The court applied the same analysis that it had to Nagi and determined that the drug quantities tied to other conspirators constituted relevant conduct for purposes of sentencing Ball.  Further, the district court noted that Ball had "an active leadership role with respect to the distribution of controlled substances in the club" and that he was "one of the longest time, old-time members, an honorary member."  The court also found that "he was in a leadership role in this club as president of the Eight Mile Chapter, and he certainly was in a leadership role and extremely active in the distribution of all kinds of controlled substances."  As discussed with regard to Ball's sufficiency-of-the-evidence claim, the conclusions by the district court are supported by the record.

## C.    Whiting

With a Guidelines range of 360 months to life, Whiting was sentenced to 420 months imprisonment.  He argues that the sentence was unreasonable and that he should not have been sentenced based on the acts of his co-conspirators.  However, the district court considered the factors in 18 U.S.C. § 3553(a) and determined that a downward variance was not appropriate.  Like the other defendants, Whiting argues that he should not be held responsible for the drug trafficking of his co-conspirators.  The district court conducted a reasoned analysis, holding him accountable only for those acts that were foreseeable to him.  Whiting was national president during much of the time at issue, and it was reasonable for the district court to infer that Whiting was involved in and foresaw the drug dealing activities of the Club.

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

**D.     Moore**

On a Guidelines range of life, Moore was sentenced to life in prison. It is well established that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000); *see also Alleyne v. United States,* 133 S. Ct. 2151, 2158 (2013). The statutory maximum for a violation of the RICO statute is twenty years, unless the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment. *See* 18 U.S.C. § 1963(a). While Racketeering Acts 1, 2, 4, 6, 9, 11, and 13 are all violations for which the maximum penalty includes life, the jury never made any special findings as to Moore's participation with these acts. Accordingly, he is entitled to a limited remand for re-sentencing with respect to Count 2. *See Corrado,* 227 F.3d at 542.

**E.     Clark**

On a Guidelines range of 292-365 months in prison, Clark was sentenced to 292 months. Clark, like Moore, was convicted of conspiracy to violate RICO, but acquitted of the substantive RICO charge. Because his sentence exceeds the statutory maximum of twenty years, like Moore, he is entitled to a limited remand for resentencing with respect to Count 2. Clark's other arguments regarding his sentence are without merit. For the reasons already discussed, the district court did not err in concluding that Clark acted as a leader in the drug conspiracy and that he is liable for the acts of his co-conspirators.

Nos. 11-1170, 11-1208, 11-1221, 11-1223, 11-1349, 11-1354
*United States v. Nagi, et al.*

## X.

Defendants' convictions are **AFFIRMED**.  However, because Moore and Clark received sentences greater than the statutory maximum of twenty years without a special finding by the jury, their judgments are **REVERSED** and **REMANDED** to the district court for resentencing consistent with this opinion.